## CLARK, Respondent, v. HAMMERLE *et al.*, Appellants.

1. In March, 1789, one Joachim Roy made his will; it was executed in the presence of the lieutenant governor of Upper Louisiana, and attested by him and seven other witnesses; it was deposited among the archives of the Spanish government and a copy thereof was given out by the lieutenant governor of said province on the 24th of July, 1801, a few months after the death of said Roy; *held*, that the will was a valid and operative instrument under the Spanish law without further proof.
2. Where an instruction given at the instance of a party to a suit is decisive thereof and excludes from the consideration of the jury the questions raised by the evidence of the opposing party, it is erroneous.
3. Hunt's minutes of testimony taken under the act of congress of May 26, 1824, are not admissible in evidence except to prove such facts as can be proved by hearsay; where, however, one party to a suit introduces them in evidence, the opposing party may have the full benefit of them.
4. A certificate of confirmation issued in 1825 by Recorder Hunt, under the act of congress of May 26, 1824, in favor of Joachim Roy's representatives, for a lot in the Cul de Sac, described the lot confirmed as bounded north by a field lot of A. Guion, and east by Auguste Chouteau's mill tract. On the margin of the claim of A. Guion are the following words: "In Chouteau's mill tract." *Held*, that this marginal entry was not admissible in evidence, as against those claiming under Roy, to show that the lot confirmed to Roy was situate within Chouteau's mill tract. The Spanish survey of "Chouteau's mill tract," in which the land on the west of the survey is stated to be "vacante," is admissible in evidence as bearing upon the question of the location of Roy's confirmation; the same weight should be attached to it as to reputation or hearsay in establishing ancient boundaries.

### Appeal from St. Louis Land Court.

This was an action of ejectment to recover possession of a portion of a lot in the Cul de Sac common field near St. Louis.

27 55
43a 398

27 55
45a 577

27 55
49a 650
50a 242

27 55
64a 312
64a 473
64a 576

27 55
65a 134
66a 642
27 55
69a 224
70a 181

27 55
71a 600

27 55
84a 601

27 55
102a ²354

27 55
97a ²570
98a ²424
99a ²403

Plaintiffs claim title under the legal representatives of Joachim Roy, to whom they allege the lot was confirmed by act of Congress of June 13, 1812. The defendants, in addition to a formal denial of the facts stated in the petition, set up the statute of limitations as a bar.

In support of his title plaintiff introduced in evidence a certificate of confirmation by Theodore Hunt, under act of Congress of May 26, 1824, with Hunt's minutes of testimony. Hunt's minutes of testimony were, as certified, in substance as follows:

" Joachim Roy's legal representatives claim a lot in the Cul de Sac, near the town of St. Louis, containing one arpent and a half in front by about forty in depth; bounded north by the field lot formerly owned by Madame Lacompte, east by the claim of widow Camp's legal representatives, south by the field lot formerly owned by Tabot, and west by land unknown, near to Gratiot's." [Here follows the testimony of Michael Marly and Joseph Roy, who testified in substance that Joachim Roy owned and cultivated the lot claimed about thirty-two years before July 8, 1825, (the day the testimony was taken) until the common field fence was taken down.]

" Francis Caillou, being duly sworn, says: He knows the lot claimed; that this deponent, forty years ago, with Joachim Roy, cultivated *this* field lot, and continued to cultivate the same with said Roy until the fence was taken down some twenty-five or twenty-six years ago. This deponent says, that his mother after the death of his father married Joachim Roy, and in that way, living with Roy, he became acquainted with this field lot. *He has no interest in this claim whatever.*" " Eustache Caillou, being duly sworn says: He knows the field lot claimed, and that upwards of thirty years this lot was owned and cultivated by Joachim Roy, who cultivated the same until the fence was taken down; and this deponent further says, *he has no interest whatever in this field lot, neither directly nor indirectly.*"

The above is recorded on pages 49 and 50 of Hunt's Minutes, book No. 2.

" Joachim Roy's legal representatives claim a common field lot in the Cul de Sac, containing one arpent and a half in front by about thirty in depth ; bounded north by the field lot claimed by Amable Guyon's legal representatives, south by Beré Tabeau's legal representatives, east by Auguste Chouteau's mill tract, and west by Charles Gratiot." In support of this claim there is recorded the testimony of Baptiste Riviere, René Dodier, and René Paul. " Baptiste Riviere, being duly sworn, says : He knows the field lot claimed, and that upwards of forty years ago this field lot was owned and cultivated by Cadet Jean Rion, who cultivated the same until he died ; and after that Fife Beaugeneau cultivated the same until it became the property of Joachim Roy, who owned and cultivated the same until the common field fence was taken down." Record of this testimony is made in book 2, page 116, of Hunt's Minutes. The testimony was taken and recorded July 30, 1825.

To the above one certificate was appended by the recorder of land titles.

The plaintiff then introduced in evidence a certified copy from Hunt's list of confirmation certificates issued under the act of Congress of May 26, 1824, to Joachim Roy's legal representatives. From this it appears that the certificate was issued July 30, 1825. The lot is described as a common field lot situate in the Cul de Sac, " one and one-half arpens front by about thirty deep ;" " bounded north by the field lot claimed by Amable Guion's legal representatives, south by the field lot claimed by Beré Tabeau's legal representatives, east by Auguste Chouteau's mill tract, and west by Charles Gratiot."

In the recorder's certificate appended to his transcript of the above it is stated that " the above is the only entry in the said list of the claim of said Roy's representatives to a lot in the Cul de Sac common field of St. Louis."

The plaintiff then offered in evidence a document purporting to be a will of Joachim Roy, devising all his estate to Verronique Guitard. The will bore date March 25, 1789,

and purported to be signed by Joachim Roy, by his mark, and by seven witnesses, and by Manuel Perez, lieutenant governor. This document was a copy certified from the "archives" by the recorder of St. Louis. In connection with this certified copy the plaintiff offered in evidence two documents, one purporting to be the original will of said Roy, of which the above is a copy, and the other purporting to be a copy thereof certified by Charles Dehault Delassus to be "a copy in conformity to the original which is deposited in the archives of the government, given to the party on his application. Given at St. Louis, July 24th, 1801. [Signed] Delassus."

Defendants objected to the admission of these documents because the will was not executed in accordance with the law then in force; because it was not proved; because it had never been acted upon or set up in any manner by any person; because the devisees therein named never claimed any thing under it, nor was it ever produced before any judge or officer; because said copies were not produced from any legal custody. It was admitted that Roy died June 25, 1801. The court overruled the objections and admitted the will and copies in evidence.

Plaintiff then introduced in evidence a will of Verronique Guitard executed August 29, 1808, by which the lot in controversy was devised to her sons, François Caillou and Eustache Caillou. This will was proved November 22, 1836; also a deed to Wm. Carr Lane, dated August 1, 1825, from Eustache and François Caillou. Plaintiff showed title in himself under Lane to that portion of the field lot which is in controversy. This portion lies at or near the west end of the field lot. The plaintiff then gave in evidence certified copies of two surveys. The first purported to be a "plat and description of a survey of a lot, one and one-half by about thirty arpens, in the Cul de Sac fields, claimed by the legal representatives of Joachim Roy, and the boundaries and extent thereof proven before the recorder of land titles on the ———— day of ————, 1825, under the act of Congress of the

26th of May, 1825." This survey (No. 3307) was approved by the surveyor general, Milburn, in 1841, with the qualification, written on the margin, that its "southern boundary must be extended eastward so as to make its whole length forty arpens, unless it comes in contact with the claim of Motard, in which event it will stop at Motard's." The second survey (No. 3307) was made in accordance with this suggestion. It was approved March 20, 1857. The land in controversy was embraced in this survey. The plaintiff then gave in evidence a certificate of confirmation to Joachim Roy's legal representatives for the Cul de Sac lot as thus confirmed. This certificate bears date March 25, 1857.

The plaintiff here closed; whereupon the defendants asked the following instructions : " 1. Upon the case made in testimony the plaintiff ought not to recover. 2. The will of Joachim Roy, as given in evidence by the plaintiff, is inoperative and void as a conveyance of the land in question to Verronique Guitard. 3. The two surveys, as given in evidence by the plaintiff, are not authorized surveys of the United States ; and neither of them is authoritative as a survey." The court refused to give these instructions.

The defendants then introduced oral testimony with the view to show that the true location of the Cul de Sac was within the Chouteau mill tract ; that the Cul de Sac had been improperly located west of said mill tract. To this testimony plaintiff objected.

The defendants offered in evidence a copy of a plat of survey of the Chouteau mill tract. The ground on the west of the mill tract is laid down as " vacante." The " second concesssion" is marked as commencing at the end of the common field lots of the old town. To this plat there is the following annotation: " Mesurée par le Lnt. Arpenteur, Don Santiago McKay, en date du 29 May, 1803, en vertu de la requête de l'interessé en date du 17 Fevrier de la même année du decret de Mons. le Lnt. Gen. Don Charles Dehault Delassus, du 18 du même mois, même année, à laquelle est jointe ; le plan figuratif de la dite terre et toute les pieces citées dans

la dite requête numerotée lesquelles j'ai remisés à l'interessé avec le certificat d'arpentage que j'ai expedié le 23 d'Aout, 1803." The court admitted said survey against the objection of plaintiff.

The defendants then offered in evidence, among other documents, the following: 1. Claim and certificate of confirmation by Hunt, dated 30th July, 1825, to A. Guion, for lot in Cul de Sac, of two by thirty arpens; bounded north by Verdon, south by 'Cadet Jean Rion,' east by the Mill tract of Auguste Chouteau, and west by the claim of Charles Gratiot. On the margin of this claim are the following words: 'In Chouteau's mill tract.' 2. Survey No. 2973, in favor of A. Guion or his legal representatives. 3. Claim by Berry Tabeau's legal representatives for one by forty arpens; bounded north by field lot claimed by Jean Rion's legal representatives. The court, on the motion of plaintiff, excluded the same.

The defendants then introduced in evidence a certified copy of the claim, &c., of J. Roy, "with the erasures." From this it appeared that the claim, as set out on page 116 of "Hunt's minutes" (see ante, p. 57) was erased and interlined as follows: The words "Cadet Jean Rion's" as claimant were erased, and "Joachim Roy's" legal representatives were inserted. The word "forty" was erased and the words "about thirty" were interlined. In what is called Hunt's list of certificates of confirmation, the words "Cadet Jean Rion" as confirmee were erased, and that of "Joachim Roy" was interlined.

Defendants claimed title under a New Madrid certificate located June 16, 1818. Other facts were adduced in evidence. It is deemed unnecessary to set them forth. The court gave the following instructions at the instance of the plaintiff: "1. The survey made by the government of the United States of the tract of land confirmed to Joachim Roy or his legal representatives is *prima facie* evidence of its true location; and if the jury find from the evidence that the premises sued for in this case are within the survey No. 3307,

read in evidence ; that the defendant Hammerle was in possession thereof at the time this suit was instituted; if the wills of Joachim Roy and Verronique Guitard and the deeds read in evidence by the plaintiff are genuine ; if the persons named in the depositions of Robert Willis and Sarah Brammell are the heirs of Samuel Brammell, deceased,—then the plaintiff is entitled to recover and the jury should find accordingly. 2. The burthen of proving that the location of the Joachim Roy tract by the United States survey No. 3307 is erroneous rests on the defendants, and, unless they have shown in evidence to the satisfaction of the jury that said location is improperly or erroneously made, the jury should stand by the location made by said survey. 3. Under the act of Congress approved on the 17th day of February, 1815, a New Madrid certificate could only be located on lands belonging to the United States, the sale of which was authorized by law ; and if the land sued for in this action was a part of the tract or parcel of land that was cultivated, claimed or possessed by Joachim Roy prior to the 20th day of December, 1803, then the New Madrid location under certificate No. 150, read in evidence, was not authorized by law and has no effect. 4. If the jury find for the plaintiff, they should assess his damages at the yearly value of the rents and profits of the premises in question, from the 16th day of September, 1856, to date, and should also fix the monthly value of such rents and profits at this time."

The court gave the following at the instance of defendants : " 5. The documents given in evidence by the plaintiff are presumptive evidence only in law, that the land in dispute was inhabited, cultivated and possessed by Joachim Roy prior to 20th December, 1803 ; and therefore if the jury find from the other evidence in the cause that the lot claimed by Joachim Roy in the Cul de Sac common field was at another and different place, and did not embrace any portion of the land in dispute, and that said Roy did not inhabit, possess or cultivate any portion of said premises in dispute prior to 20th December, 1803, they will find for the defendants."

5—VOL. XXVII.

The following instructions asked by the defendants were refused: " As to the will of Joachim Roy, as given in evidence by the plaintiff, the court instructs the jury as follows:

" 1. If the said Joachim Roy died before transfer of Louisiana to the United States, the law required that the will, in order to be valid as a conveyance of title, should be produced before a public tribunal or officer, and proved or otherwise recognized as the will of the deceased; that the heirs or others claiming under the will should make their election whether they would or would not take under the will; and if they elected to take under the will, they should make before the tribunal or officer an inventory of the estate. 2. If said Roy died after the transfer of the country to the United States, the law required that the will should be probated by the public authority before it could be operative as a will conveying property. 3. There is no evidence before the jury tending to prove that said will, after the death of said Roy, and before the change of government, was ever produced before any tribunal or officer and proved or otherwise recognized as the will of said Roy; that the constituted heir ever set up or recognized the will by accepting or rejecting its provisions; or that any inventory was ever made of the estate. Therefore, under the Spanish law of the province, the will is inoperative and void as a conveyance of the land in question."

" As to the confirmation and survey : 1. The confirmation to the representatives of Joachim Roy, given in evidence by the plaintiff, is by the act of Congress of 1812, and the supplemental act of 1824, and as no such survey thereof was provided for by law none was legally necessary to the support of the rights of the confirmee. 2. The two surveys thereof given in evidence by the plaintiff are at most only *prima facie* evidence of the true locality and not conclusive. 3. As to the last of the two surveys, if it be for a larger quantity of land than by the evidence before the jury appears to have been confirmed, it was made without authority and ought to be rejected. 4. As to the certificate of confirmation given in

evidence, dated 24th March, 1857, is no evidence that the land therein mentioned had been *lawfully surveyed*, as is stated in said certificate.    5. Inasmuch as there is no evidence in this cause that the will of Roy, dated 28th March, 1798, was ever proved, or any official action had thereon, or that the devisee therein named ever appeared before any tribunal or officer to accept or reject the devise, that no inventory was ever made or any administration had upon his estate; and inasmuch as it does appear that the said will remained dormant in the archives for more than twenty years after the death of said Roy, and that the devisee and her representatives therein named during all that time failed to treat said will as valid, or to set up any claim under it, and acted in regard to the estate of said Roy as though he had died intestate; and that Eustache and Francis Cayou appeared before the recorder of land titles in 1825, and expressly disclaimed under. oath having any interest directly or indirectly in said premises, the jury are instructed that the evidence is not sufficient to entitle the plaintiff to recover, provided the jury find that Roy died in 1801, and that the 'disclaimer of said Francis and Eustache was made prior to the execution of their deed to Lane, and while they were the representatives of any claim of Verronique Guitard to the premises in dispute under said will.    6. If the jury find from the evidence that Joachim Roy did not inhabit, cultivate or possess any portion of the premises embraced within the United States survey No. 3307, for several years prior to his death; that said Roy died in 1801; that no inventory was ever made of, nor administration ever had on his estate; that Guitard, the universal devisee in the will of Roy, dated 28th March, 1789, survived him for several years, and that both said devisee and her representatives acted in regard to the estate of said Roy for more than twenty-four years after his death. as though he had died intestate, and during all that time neither treated said will as valid, nor set up any claim under it to any property whatever, nor ever appeared before any officer or tribunal to accept or reject the devise therein

made; that said will was never proved, nor any official action had thereon, and had remained dormant in the archives for more than twenty years after the death of said Roy; and if the jury further find that Francis and Eustache Cayou, in July, 1825, prior to the execution of their deed to Lane, disclaimed under oath having any interest directly or indirectly in said premises, they will find for the defendants. 7. If the jury find from the evidence, (in the absence of proof of any grant, survey or permission to Roy or any other person to occupy the premises in dispute under the Spanish government,) that J. Roy ceased to cultivate or possess the land in question several years prior to the change of government in 1803, and also several years prior to his death, and that neither said Roy nor his representatives inhabited, possessed or cultivated said premises for more than twenty-five years from the time said Roy so ceased to cultivate said premises, and that neither said Roy nor his representatives set up any claim to said premises until the year 1825; and that Francis and Eustache Cayou appeared before the recorder of land titles in 1825, and under oath disclaimed having any interest directly or indirectly in said premises, and that such disclaimer was prior to the execution of the deed of said Francis and Eustache to Wm. C. Lane; and if the jury further find that the land in dispute from the time Roy ceased to cultivate the same until the year 1825, was of little or no value, they will be well warranted in finding for the defendants on the ground that Roy and his representatives had abandoned said premises. The jury are instructed that there is no evidence that the paper purporting to be a copy of the will of Joachim Roy ever formed a part of the archives of the French or Spanish government, or that the same is a copy of any genuine document, and the jury ought to disregard it. 8. If the jury find from the evidence that Cadet Jean Rion or his representatives appeared before the recorder of land titles in 1825, and claimed the same premises embraced in the United States survey No. 3307, and that a certificate of confirmation therefor was made by said recorder to said Rion

or his representatives, and that subsequently the name of said Rion was erased and the name of Joachim Roy inserted in both said claim and certificate, and that the plaintiff claims under Joachim Roy by virtue of the certificate as thus altered, they will find for the defendants. 9. There is no evidence before the jury tending to prove that said will since the change of government was ever probated, or that it was ever set up and attempted to be maintained as the will of Roy before any judicial tribunal or officer. Therefore, under the American law of the territory and state, the will is inoperative and void as a conveyance of the land in question."

Verdict was given for plaintiff and judgment rendered accordingly.

*Bates*, *Gamble* and *Gibson*, for appellants.

I. The extract from the registry of certificates is, at best, only *prima facie* evidence of title. It is no evidence of any thing but what is expressed on its face. The "registry" does not seem to be the "list" which the act of 1824 directs the recorder to send to the surveyor. The certificate of confirmation issued March 24, 1857, ought not to have been received in evidence. The only certificate authorized by law had been issued long before. This was a second certificate not authorized by any law. It contains matter which the recorder was not competent to certify. He had nothing to do with the surveys. His only lawful action necessarily precedes the survey. No survey was required by law nor needed in fact. The act of 1812 does not require the lots thereby confirmed to be surveyed; nor does the supplementary act of 1824.

II. The will of Joachim Roy ought to have been rejected. It is not a valid will by either Spanish or American law. (2 Partidas, p. 1018, Law 11; p. 1014, Laws 4 & 5.) It was not proved nor set up and used as a will in Spanish times by either of the parties in interest or by any officer of government. The heir may renounce. (Id. Law 13, &c.) The Spanish law was not complied with. No inventory was made and no property claimed under it. It remained dormant for

thirty-six years after its date, and twenty-four years after the death of the testator. It was never probated. (Meegan v. Boyle, 19 How. 130.) The very beginning of our territorial legislation recognizes the preëxisting state of the law on this point. (1 Terr. Laws, p. 31–33, 131–2.) If valid as a will, still it did not convey this land. Roy died in 1801, showing no grant, permit or survey. His title, if he had any, was begun and completed in 1812, and therefore could not pass by the will.

III. The locality of the ground as surveyed is wrong. The two surveys (with one number, 3307), if otherwise lawful, contradict and annul each other. The testimony shows plainly that the actual cultivation of Roy was at another place.

IV. If Roy ever had any right it was abandoned. He never had a better claim than a naked possession, and that he ceased to have for many years before his death. No pretensions were set up in his name till twenty-four years after his death, and then his claim is proved up by two men who had the best means of knowing what and where he cultivated, and they place it far from the present location. They swear that they had no interest in the land, though they sell it a few days afterwards.

V. The court erred in excluding the plat of Chouteau's mill tract, and the confirmation of A. Guyon with the recorder's note that it was in the mill tract.

VI. The first instruction given for plaintiff, taken alone, is plainly erroneous. It begins by declaring Roy's survey *prima facie* evidence of true location, and ends by making it conclusive. It is not cured by the second instruction. The third instruction relative to the New Madrid location is erroneous and calculated to mislead. Any question of abandonment was entirely cut off, so that the jury were substantially forbidden to consider the evidence with respect to it.

*Krum & Harding*, for respondent.

I. Hunt's minutes, the registry of confirmation and the survey approved by Milburn in 1841, established, *prima facie*,

the fact that Joachim Roy inhabited, cultivated or possessed the land in question prior to December 20, 1803. (Joyal v. Rippey, 19 Mo. 660 ; Soulard v. Allen, 18 Mo. 590 ; 11 Mo. 25 ; 21 Mo. 243 ; 15 Mo. 80.) These were questions for the jury. The court will not disturb the verdict on the ground that it is against the weight of evidence. (Fine v. Public Schools, 23 Mo. 570.) The weight of evidence is on the side of the plaintiff. Roy's lot was correctly located.

II. The court properly admitted the will of Joachim Roy. It was an ancient document and was executed according to the requirements of the Spanish law. (White's Recop. 104 ; 3 Mart. O. S. 115–6.) It was in the most natural and proper custody when produced, that of W. C. Lane, who, once owning the whole tract, had subdivided and sold it in parcels. There was evidence proving, *prima facie*, the possession by Roy of the land devised, and of modern user by the party who had the custody of the will at the time of trial. (1 Greenl. Ev. § 21, 141, 144, 570.) Its authenticity was further shown by the copy made and certified by Delassus. The case of Meegan v. Boyle, 19 How. 130, is not in point. There was the requisite number of witnesses ; there was no condition in Roy's will ; there is no evidence showing that Roy's devisee renounced, but there is evidence tending to show an acceptance. It appears affirmatively that Roy had no child or children, and it does not appear that he had any heirs ; consequently, he did not disinherit any one. The rules prescribed by the law with reference to the probate, &c., of will were complied with as far as possible. It was deposited among the archives. (McNair v. Hunt, 5 Mo. 300 ; Charlotte v. Chouteau, 21 Mo. 590.) Roy's will did not remain " dormant ;" it was acted on by his devisee in 1808 and her heirs in 1825. There was no administration on Roy's estate. There was no necessity for Roy's devisee or her heirs to assert rights which none disputed. The will of Roy is valid on its face. It contains every essential requirement of the law ; it was treated as valid by the devisee and never questioned by any one until the present time. (White's Rec. 104 *et*

*seq.;* see 2 How. U. S. 335; 19 Mo. 221; 5 Mo. 300; 2 La. Ann. 503; 3 La. Ann. 146.) Even if, subsequently to the death of Roy, his devisee or executrix failed to take steps required by the Spanish law, the will was not annulled by such failure. This would only give the heir at law an opportunity to avoid the will so far as to enable him to claim his distributive or heritable share of the estate. If he acquiesced, no stranger could take advantage of the failure. (White Recop. 116; Charlotte v. Chouteau, 21 Mo. 590.)

III. The court properly excluded the survey of the Chouteau mill tract made by Mackay in May, *1803;* also the Guion and Tabeau surveys and confirmations; also the testimony of the witness, called after plaintiff closed his rebutting testimony, to cumulate testimony upon the question of the location of MacRee's house, after having previously examined a witness fully on that point and the rebutting testimony not touching the point.

IV. The court did not err in giving or refusing instructions.

SCOTT, Judge, delivered the opinion of the court.

The most important question in this cause grows out of the will of Joachim Roy made in March, 1789. The will was executed in the presence of the lieutenant governor of the province (in default of a notary), and was attested by seven witnesses, together with the lieutenant governor. The will, it seems, was deposited among the archives of the Spanish government, and a copy of it was given out by the governor on the 24th of July, 1801, a few months after the death of the testator. Whether this was a valid instrument without further proof under the Spanish law is the question now submitted.

By the common law a will of real estate was not proved in a probate court like a will of personalty. No probate was necessary to a will devising real estate. Indeed the probate courts in England had no authority to take the proof of such

wills. A will of the realty, when offered in evidence, was proved like a deed by the subscribing witnesses thereto, and presumptions in proof of ancient wills were indulged as in case of deeds.

Under the Spanish law there were several kinds or species of wills. (Febrero, Libro 1, tit. 8, § 2.) The will involved in this litigation was under that law denominated an open or nuncupative one. A nuncupative will might be made with or without the assistance of a notary. (Civil Code of La. art. 1571 and 1574.) Nuncupative wills received by public acts were not required to be proved. Their execution might be ordered ; they were full proof of themselves, unless they were alleged to be forged. (Art. C. C. 1640.) It may be said that the civil code is composed of legislative enactments and is not evidence of what the Spanish law was, as that law may have been changed by the legislature in adopting it into the code. But the Spanish law is the substratum of the code, just as the common law is of the legislation of this state. An annotation on the 32 law, tit. 16, Partidas 3, shows that the law of the code is in conformity to the Spanish law. That annotation says that when a will is made without the authority (authorizacion) of the notary, the testament must be proved by the witnesses ; clearly intimating that, if made in his presence and by his authority, no such proof would be required. To the same effect is note 4, law 3, tit. 2, Partidas 6. All the law cited from the Partidas in relation to testaments in the case of Meegan v. Boyle, 19 How. 149, concerns mystic or sealed wills, a will of a different species from that now under consideration ; and by the Spanish law, as well as by the code of Louisiana, each species has its particular mode of authentication and proof, the law sustaining the will, though intended for one species and failing under it, provided it can be maintained as valid under any other species. It is only necessary to turn to the second volume of the translated Partidas, at the beginning of the second title, p. 975, to be satisfied that the law cited in the foregoing opinion relates to secret wills, the manner of making which

may be seen by reference to pages 962 and '3 of the same volume, and to Febrero, tit. 8, § 6. In confirmation of all this, we find that the wills made here under the Spanish government were executed with the assistance of a notary or of some one deputed by the chief officer of the province or of that officer himself, and were left among the archives of the government, just as by the Spanish law wills received by public act were left in the offices (*escribanias*) of the notaries. We find no evidence that proof was ever made of such instruments, but that copies of them as public acts were delivered to the interested. Having intimated our opinion on this subject, if we have mistaken the Spanish law we can easily be corrected by reference to the learned in that law residing in our sister state, whose code has been used on this occasion.

In the trial of causes neither party is bound to ask instructions. If they are not asked, the giving them or not is at the discretion of the court. If instructions are asked on the whole case or of any particular matter arising out of it, which the court refuses, it is not bound afterwards to give instructions of its own as substitutes for those refused. If erroneous instructions are asked and refused, it is entirely at the option of the judge whether he will afterwards give any or not. A party therefore who asks an instruction on the whole case must not frame it so as to exclude from the consideration of the jury the points raised by the evidence of his adversary. If a suit is on a bond for the payment of money, and the defendant gives evidence tending to show that he has paid it, it would not be proper for the court, at the instance of the plaintiff, to instruct the jury that if they believed that the defendant executed the bond, they will find for the plaintiff. Such instruction would be erroneous, as it would exclude from the jury all consideration of the question of payment. It is no answer to this to say that the defendant might have asked instructions. He was not bound to do so, and it was at the peril of the plaintiff to ask instructions disposing of the whole case which excluded from the jury the consideration of the evidence of the defendant's tending

to show that he had no right to recover. We do not see how the depositions of the witnesses accompanying the record of the confirmation of the recorder are evidence of the facts stated in them. How they can be evidence at all except as to such matters as may be proved by hearsay it is difficult to say. This court has refused to reverse judgments in cases wherein they were read, not because they were regarded as any evidence of the facts stated in them, but because they might be admissible for some purposes, and being so it was the business of the opposite party to call upon the court to declare their effect in evidence. When reading the record as mere evidence of a confirmation, they should not be read. A record of a judgment is read in evidence; would the depositions embodied in the bill of exceptions be read, or could they be evidence? (Toncy v. City of St. Louis, 21 Mo. 243; Soulard v. Clark, 19 Mo. 570.) If the original deposition was produced and the hand-writing of the witness proved, it would be evidence against him. But the plaintiff himself used such evidence, and it was of course open to the defendant, and they had a right to the full benefit of it. Under this view the depositions of the two Cailloux were evidence of an abandonment or of the non-existence of a claim on their part to the land in controversy. Whether the lot of which they spoke was the lot in controversy or another lot was for the jury to determine from the evidence. The defendants being so unfortunate as to have all their instructions on the subject of abandonment rejected by the court, the court was not therefore warranted in putting the case to the jury in such a way as would exclude the consideration of the effect of the evidence given by them on the subject of abandonment.

As the defendants had the benefit of the claim of J. Roy with the erasures in evidence, and as such evidence was of a tendency to throw doubt and mistrust on the claim of Roy, the claims of Guion and Tabeau, as they refer to Rion, were of some influence in strengthening the weight of the evidence of the erased entry. Certainly those papers mutu-

ally strengthen and support each other as evidence for the defendant. We are not aware of any principle which would make the writing on the margin opposite the confirmation of Guion as it stands on the record any evidence whatever, except in a criminal prosecution against him who made it. We know no law nor practice which warrants any such thing, and nothing would prove more dangerous to titles passing through that office than the giving the least sanction to such evidence.

The survey of Chouteau was evidence on the ground that, it being a call in the description of the boundaries of the lot in dispute as well as of those by which it was bounded, it was proper in locating the lot in dispute, the proper location of which was one of the matters in controversy. We do not regard the annotations on the plat of the survey in the light of the unauthorized writings on the margin of the recorder's confirmations or claims. This survey is an ancient document. It is found among the Spanish archives. Its authenticity is not questioned. Under such circumstances it seems that on principle it would have the weight given to reputation or hearsay in establishing ancient boundaries.

There was no error in admitting in evidence the certificate of the recorder. (Soulard v. Allen, 18 Mo. 590 ; McLott v. Dubriel, 9 Mo. ——.) The first section of the act of 29th April, 1816, providing for an appointment of a surveyor of the public lands in Illinois and Missouri territories, made it the duty of the said surveyor to survey all lands the claims to which had been or should thereafter be confirmed which had not already been confirmed.

There was no error in refusing the instructions asked by the defendants. Almost all those instructions contained matter relative to the will which is hostile to the views of the law herein expressed, and were therefore properly overruled.

The instruction relative to the alteration of a confirmation was properly refused, because it assumed as a matter of law that the alteration would defeat the right of those claiming under Roy, when Roy had a confirmation independent of that

which was altered.   The whole matter with all its circum-
stances was a proper one for the consideration of the jury on
the trial of the issues submitted.

We see no ground whatever for the refusal of the court to
hear the evidence offered by the defendants after the plaintiff
had given evidence in rebuttal.   (Rucker v. Ewing, 7 Mo.
115.)   The judgment is reversed and the cause remanded.
The other judges concur.