SAMUEL S. BOYD, *et al.*, Respondents, *vs.* ALFRED JONES, *et al.*,
Appellants.

1. *Sheriff's sale—Combination of bidders will not vitiate unless designed to de-
press bids.*—Judgment creditors may agree among themselves that one of their
number shall at the execution sale bid for all, and for an amount sufficient to
indemnify themselves. And such a combination will not vitiate the sale unless
made for the purpose of depressing the bids.

2. *Evidence—Declarations of vendor of personal property after sale—When com-
petent as against vendee.*—The declarations of a vendor of personal property
made by him while in possession after sale, are receivable against the vendee,
as part of the *res gestæ*, to make out a case of fraud against his creditors.

3. *Evidence—Combination of parties to a deed to defeat creditors—Declarations
of grantor after date of deed—Competent as against grantee, when—Combina-
tion must be shown, etc.*—Generally the declarations of a grantor, made after
the execution of his deed, cannot be made use of to defeat it; but the rule is
otherwise where the parties to the instrument have entered into a common
scheme to hinder and delay the creditors of the maker, and the declarations
are made by the grantor while engaged in the prosecution of that plan. But
in such case the common design and undertaking must first be proved by evi-
dence *aliunde*, before his declarations are admissible. The fact that the gran-
tee subsequently assents to and joins in the fraudulent undertaking, will not
render such declarations of the grantor, made prior to their confederation,
competent to overthrow the deed.

4. *Fraudulent conveyances—Transfer of all one's property except that exempt from
execution—Presumption arising from.*—The fact that one being heavily indebted
conveys away all his real and personal property, "except such as is exempt
from sale under execution," is a circumstance tending to show fraud in the
grantor.

*Appeal from Ray Circuit Court.*

This suit seems to have been commenced on the 25th day
of October, 1867, and afterwards taken, by change of venue,
to the Circuit Court of Ray county, and was there tried on
an amended petition.

*Hall & Oliver Vories and others*, for Appellants.

I. Statements made by a party after assignment are not ad-
missible to affect the title of the assignees. (Stewart vs.
Thomas, 35 Mo., 202 ; Enders vs. Richards, 33 Mo., 598 ; Gar-
land vs. Harrison, 17 Mo., 282.) The admissions of a gran-
tor in a deed of trust, after its execution, are admissible in
favor of the *cestui qui trust*, though not against him ; and

such admissions are not competent against the grantee or assignee. (McLaughlin vs. McLaughlin, 16 Mo., 242 ; Weinrich vs. Porter, 47 Mo., 293.)

II. The deed from McGirk to Thomas J. Jones, for the land in controversy, under the deed of trust, was improperly excluded as evidence offered by defendant Jones, to prove his title. It was *prima facie* good until attacked for fraud. But the court pronounced it fraudulent and void before the evidence was heard, or any offer to impeach it. This deed was dated September, 1869, and respondent's amended petition was not filed until 1871.

III. The evidence shows an agreement entered into on the day of the sale of the land by the sheriff, on the part of the respondents, to purchase the property by one for all, and to refrain from bidding, which operated to repress bidding, and was a fraud upon the debts. (Wooten vs. Hinckle, 20 Mo., 290 ; Neal vs. Stone, 20 Mo., 294; Hook vs. Turner, 22 Mo., 333 ; Stewart vs. Severance, 43 Mo., 322.)

*H. Wallace & John E. Ryland, with Doniphan & Garner,* for Respondents.

I. The declarations of Alfred Jones in regard to his son Thomas, whilst in California, after the date of the deed of trust, July 23, 1863, were competent against Thomas J. Jones, in connection with the other evidence in the case, showing a conspiracy, or common purpose entered into between Alfred Jones and Thos. J. Jones, or acquiesced in by Thos. J. Jones, to cover up the property of Alfred Jones and defraud his creditors. (Weinrich vs. Porter, 47 Mo., 293 ; Waterbury vs. Sturtevant, 18 Wend., 353 ; Cuyler vs. McCartney, 33 Barb., 165 ; Peck vs. Crouse, 46 Barb., 151 ; Gamble vs. Johnson, 9 Mo., 605.)

II. The court below properly excluded the pretended deed made by Isaac M. McGirk, on the 9th day of September, 1869, as trustee, to Thomas J. Jones, for the lands in controversy, on private sale, during the pendency of this suit and two years after the suit was commenced, not for cash, as author-

ized by the deed of trust, but for depreciated notes and choses in action, impeached as partly paid, and partly fraudulent and fictitious, in this suit, then pending, to which both McGirk and Thomas J. Jones were parties and had answered. (O'Reilly vs. Nickerson, 45 Mo., 160, 165, 166 ; 1 Sto. Eq. Jur., §§ 405, 407; Murry vs. Ballou 1 Johns. Chy., 566 ; Stone &. Warren vs. Connelly, 1 Metc., [Ky.] 655 ; Frem. Judg., 228 ; Cord Leg. Eq. Rights Mar. Wom., Ch. XLIV, p. 597, § 1043.)

III. The pretence set up in the amended answer of defendants, Alfred Jones and Thomas J. Jones as to an alleged conspiracy and combination at the sheriff's sale, at which plaintiffs purchased the lands, in November, 1855, to depress the price of the lands and stifle bidding, is entirely unsupported by the evidence.

Plaintiff had a clear right to agree to bid on these lands, and make them bring the amount of their debts, or buy them. (Stewart vs. Severance, 43 Mo., 322.)

VORIES, Judge, delivered the opinion of the court.

By the petition in this case, it is stated that in the year 1862, Alfred Jones was indebted to each of the plaintiffs as well as others, in various sums of money, amounting in the aggregate to about two thousand dollars, for which said several sums he executed to the respective parties his several promissory notes ; that in the latter part of the year 1863, suits were brought on said notes and judgments recovered thereon in the Lafayette Circuit Court, in the month of May, 1864; that after the rendition of said judgments, executions were duly issued thereon and delivered to the sheriff of Lafayette county, by virtue of which, said sheriff levied upon and seized, with other property, the following lands situate in said county, as the property of said Alfred Jones, to-wit: the west half of the south west quarter of section twenty-five, in township fifty-one of range twenty-seven, except twelve acres taken off the east side thereof; also twelve acres of the west half of the south west quarter of said section ; also twenty-eight acres off the

west side of the east half of the south west quarter of said section; that afterwards said sheriff in due form of law, on the 22nd day of November, 1865, sold said lands by virtue of said executions and levies, at which sale the plaintiffs became the purchasers of said lands, at and for the sum of $———; that said sheriff thereupon executed and delivered to plaintiffs a deed to said land in due form of law.

The petition alleges that on the 23rd day of July, 1863, the said Alfred Jones, with a view to defraud, hinder and delay plaintiffs and other creditors of said Jones, by his deed of that date, commonly called a deed of trust, conveyed or professed to convey to the defendant, Isaac M. McGirk, as trustee, said tracts of land, together with a large quantity of personal property, for the pretended purpose of securing the payment of certain debts or pretended debts therein stated to be due from said Alfred Jones to various persons therein named, to-wit: to Isham and Elizabeth Martin the sum of $850, with interest; to Thomas J. Jones the sum of $5,350.00, by virtue of a note alleged to be dated the 5th day of October, 1857; to Washington Talbott the sum of $715; to one —— Rucker the sum of $200; and to one —— Russell the sum of $100; that said deed of trust was duly recorded and was executed, made and contrived by said Alfred Jones, to defraud, hinder and delay plaintiffs and other creditors of said Alfred Jones in the collection of their debts against said Alfred Jones, and to cover up his property from said creditors; that the intent to defraud was contrived by including, in said deed of trust, some real debts of said Jones, with other pretended and fictitious demands against him, and thus to incumber said land and property with some valid debts of an inconsiderable amount compared with the whole of the indebtedness named in the deed, intending at the time to pay the holders of said valid debts and get the same under the control of himself and family, and keep the same, together with said fictitious debts, as apparent liens to cover said property so as to hinder and delay his real creditors, and thereby secure the use and benefit of said property to himself without the payment of his

just debts; that there was, and is in reality, no such debt due from said Alfred Jones to Thomas J. Jones, as that described in said deed of trust, as a debt of $5,350.00; but that the same was gotten up as a device to cover up said property as aforesaid; that there was no consideration for said note; that Thomas J. Jones is a young man, a son of said Alfred, and controlled by him, and was at the time wholly destitute of means; that the debts named in said deed of trust as being due to said Washington Talbott, and to Isham and Elizabeth Martin were long since paid with the means of said Alfred Jones, through one William H. Day and other persons, and that a pretended and fictitious assignment, of the claims and judgments which had been rendered thereon against said Alfred Jones, was, by the direction of said Alfred, made to said William H. Day, as trustee for the wife of said Alfred Jones, for the purpose of keeping said property covered by the apparent lien of said pretended debts after the same had been fully paid; that said Day had no interest in said debts, but was used by said Alfred Jones and wife for the purpose of covering up his property and withholding the same from his creditors; that the debts, named in said deed of trust, as being due from said Alfred Jones to said Rucker and Russell were either originally pretended and fictitious, or have long since been paid by said Alfred Jones, and have been fraudulently assigned to said Day for the same purpose for which the assignment of the other debts were made; that whatever just or real debts were named in, or secured by, said deed of trust have been fully paid as aforesaid; that the only debt named in said deed of trust which has not been paid, is the pretended debt of $5,350.00 to said Thomas J. Jones, which is pretended and fictitious.

It is further charged by the petition, that by the said deed of trust and other conveyances made by said Alfred Jones, about the same time, all the property of the said Alfred Jones subject to execution under the laws of this State, was conveyed away and covered up from plaintiffs and other creditors, leaving nothing in his name to satisfy the same or any

part thereof; that the said Alfred Jones has always, since the making of said deed of trust, lived upon and enjoyed the use of said land; that by virtue of the purchase of said lands by plaintiffs, they became the owners of and entitled to said land, or to the equity of redemption in and to the same, so far as there were *bona fide* debts provided for in said deed of trust.

It is therefore prayed, that if there are any valid subsisting liens, upon said lands, by virtue of said deed of trust, plaintiffs may be permitted to redeem said land by the payment of such debts, and that said deed, as to other fictitious creditors named therein, may be declared to be fraudulent and void, and that the same be canceled so far as the rights of plaintiffs are concerned, etc.

The plaintiffs, before the filing of answers by defendants, dismissed their suit as to defendants Talbott, Rucker and Russell.

The suit was removed to Ray Circuit Court for hearing, by change of venue. At the March term of the Ray Circuit Court, for the year 1872, the defendants, Alfred Jones, Thomas J. Jones and McGirk, each filed a separate answer to the petition. The defendant, Alfred Jones, in his answer admitted his indebtedness to plaintiffs and others, as set forth in the petition, and also admitted the execution of the deed of trust to McGirk, as charged, but averred that said deed of trust was executed for the honest purpose of securing the just debts of said defendant, as therein named. The said answer then, after denying material allegations of the petition sets up, as a defense to plaintiffs' action, that the plaintiffs associated themselves together at the time of the sale of the lands by the sheriff, as charged by plaintiffs, with the intention that one of their number should bid for said land for all of them, thereby to depress competition at said sale and thus to procure said land at a mere nominal sum, and that they did thus bid for said land, and that the bid so made by them was the only bid made for said land at said sale; that no opposing bid having been made the land was sold and conveyed to said plaintiffs, who thereby received no title to said land, etc.

Thomas J. Jones, by his answer, admits the execution and delivery of the deed of trust to McGirk, by his father, Alfred Jones; but he avers that it was executed for the honest purpose of securing the just debts of said Alfred therein named. He denies all fraud and all other material allegations of the petition, and relies on the same alleged combination on the part of plaintiffs, set up by Alfred Jones in his answer; after which he sets up as an additional defense, that he, on the ninth day of September, 1869, having become the owner of all the debts named in, or secured by, said deed of trust given to McGirk, then amounting to over $14,000.00, purchased the land named in the petition and in said deed of trust, from said trustee, under the power given in said deed of trust, for the said sum of $14,000.00, the same being honest debts of said Alfred Jones, and said sale being honestly and fairly made by said trustee, and the price paid being more than could be obtained for said land from any other person; that said trustee, by deed of that date, conveyed said lands to said defendant, who is now the legal owner thereof, etc.

Defendant, McGirk, denied all fraud on his part, or knowledge of fraud in others.

Replications were filed, putting in issue the affirmative allegations of the answer.

At the March term of the Ray Circuit Court for the year 1873, a trial was had and a decree rendered, in favor of the plaintiffs, in conformity to the prayer of the petition.

The defendants, in due time, filed motions for a rehearing and in arrest of the judgment, which, being severally heard and overruled by the court, the defendants excepted and have brought the case to this court by appeal.

There are several questions raised in this court for consideration, growing out of the action of the Circuit Court upon the trial of the case.

No question is made, in this court, as to the regularity of the judgments, executions, levy and sale of the land in controversy, by the sheriff, to plaintiffs, and of the deed made to plaintiffs by the sheriff, for the same; the only objection made

to the validity of said sheriff's sale being that the plaintiffs had associated themselves together for the purpose of making a joint purchase of the land, which it is contended had the effect to prevent competition at the sale, and that it thereby rendered said sale void.

The evidence to sustain this objection was to the effect that there were some four or five judgments and executions in the hands of the sheriff, which were in favor of several plaintiffs in this suit in different amounts, amounting in the aggregate, to between fifteen hundred and two thousand dollars. The judgments upon which these executions had been issued had all been rendered at the same term of the Lafayette Circuit Court, and therefore the lien thereof upon the land in controversy were of equal dignity. The executions were all levied on the land in controversy, together with other property, all of which had been conveyed away or incumbered to its full value, by Alfred Jones, the defendant in said executions, and it appears to have been believed by plaintiffs, that the conveyance of said land and the incumbrances placed thereon had been so placed on said land to hinder and delay creditors and that the same might be set aside by a suit at law, but that, neither one of the plaintiffs was willing to purchase the land at the sheriff's sale and litigate the questions as to the legality of the incumbrances thereon for the amount of his individual debt; wherefore, the plaintiffs all agreed that one of their number should bid for the land, for the joint benefit of all, and that they would continue to bid on said property until it was run up to the aggregate amount of all of the executions in the sheriff's hands, if the same could not be purchased for a less sum, and that the land, when so purchased, should be the joint property of all of the plaintiffs. It is further shown that, in pursuance of this agreement, the land was purchased at the sheriff's sale by the plaintiffs. It is insisted by the defendants that this purchase was illegal and void, and could confer no title on the plaintiffs.

It does not appear from the evidence that it was any part of the intention of the plaintiffs to depress or lessen the price

at which the land should be sold, but on the contrary, the only witness who testified on this subject states that the plaintiffs were anxious that some person should bid an amount for the land sufficient to satisfy the executions ; that if this had been done, plaintiffs would have at once desisted from bidding ; that they did not want to purchase the land, but to collect their debts.

In the case of Wooten vs. Hinkle, (20 Mo., 290) it is stated " that a combination of interests to purchase property at sheriff's sale, will be valid or not according to the views with which it is made. · If it is effected with a design to depress the price, it will be void; but there may be circumstances which will render.a combination at a sale lawful, when it is entered into with no improper view." This, it is said by · Judge Scott, is not inconsistent with the decision in that case.

In the case of Stewart vs. Severance (43 Mo., 334), Judge Wagner, when discussing this same subject, remarks, that the defendants in that case, "for the purpose of indemnity, and saving themselves harmless from liability, had the unquestioned right to agree among themselves that they would bid an amount sufficient for that purpose ; and if they were guilty of no improper conduct, and resorted to no trick or artifice calculated to depress the price or deter bidders, the sale should stand, notwithstanding it may have inured greatly to their benefit. To make the transaction fraudulent, it should be shown that there was a conspiracy to depress the bidding." The quotation just set forth would seem to dispose of the question now being considered in this case ; there was nothing unlawful in the arrangement and purchase made by plaintiffs, there was no attempt or purpose to depress or discourage bidding, and the sale was good and valid.

The defendant saved several exceptions to the rulings of the court in the admission of evidence objected to by the defendants, and which rulings of the court, it is insisted, were erroneous ; but it will be more convenient to consider said objections in connection with the discussion of the merits of the case as developed by the evidence.

It appears from the evidence in the case, that in the year 1862, Alfred Jones was indebted to the plaintiff in about the aggregate amount named in plaintiff's petition, and owing also some other debts which are undisputed; that in October, 1863, plaintiffs commenced suits on their several demands, and recovered judgments thereon in May, 1864, as charged in plaintiff's petition; that on the 6th day of July, 1863, Alfred Jones and wife, by deed which was acknowledged on the 23d day of July, 1863, conveyed to one William M. Duggins (who was their son-in-law) several tracts of land, amounting in all to nearly two hundred acres, which was situate near Lexington in Lafayette County, Missouri, and in and by the same deed they conveyed to Duggins a number of horses, mules, colts, cattle, hogs, wagons, harrows, plows, plow-gear, double-trees, single-trees, grain cradles, mowing scythes, wheat fan, etc., together with several negro slaves named in said deed. The said personal property included all of the stock and farming utensils then owned by said Alfred Jones. This land and personal property purported in said deed to have been sold to said Duggins for the consideration of nine thousand dollars, of which, it is recited in the deed, that three thousand dollars was paid in hand, and the remainder secured to be paid by three promissory notes executed by said Duggins, and payable to Alfred Jones or order, for the sum of two thousand dollars each, one of which was payable one year, one payable two years, and the other payable three years from date. A lien for the deferred payments was specifically reserved in the deed.

It further appears, that on the 23d day of July, 1863, the same day on which said deed executed to Duggins was acknowledged, said Alfred Jones and wife executed a deed commonly called a deed of trust, by which they conveyed to one McGirk the land named in the petition, together with the following described personal property, to-wit: "All my household and kitchen furniture now in and about the dwelling house and kitchen on said lands, now occupied by me, consisting of beds, bedding, tables, chairs, sofas, bureaus, car-

pets, stands, lamps, curtains, shades, knives and forks, china and earthen ware, etc., etc., except such of said articles and property as is by law exempt from levy and sale on execution when owned by the head of a family." This deed also conveyed some negroes, all of which was conveyed to said McGirk in trust to secure the payment of certain debts named therein, as stated in the plaintiff's petition.

The plaintiffs offered and read in evidence on the trial, a petition in bankruptcy filed in the United States Bankrupt Court by said Alfred Jones in December, 1868, together with the schedules filed therewith and proceedings thereon, by which it appeared that said Alfred Jones was insolvent, having no property at the time of filing said petition. This evidence was objected to by the defendants, because it was irrelevant, not tending to prove any issue in the cause. It was also objected to said evidence that it could only be construed to be the admissions of Alfred Jones made some six or eight years after the right of Thomas J. Jones had accrued, and hence was wholly incompetent as evidence as against said defendant, Thomas J. Jones. The court overruled the said objections, and admitted said evidence, to which exceptions were saved.

James Iles, a witness for the plaintiff, testified that he was acquainted with Alfred Jones, and had a conversation with him in the latter part of the year 1863, or the forepart of the year 1864, at the house of said Jones; that in said conversation Jones stated that he was sued by a lot of men, Crittenden, the Bank and others; that he also said he had a bad set of children; that he had sent money to California to bring his son, Thomas J. Jones, home; that he wished Thomas had died before he got home; that he did not know whom they "took after," as they did not take after him or their mother; that he had them all to support; that he wished he had his property in his pocket, he thought he was smart enough to get it there, and then they might "whistle."

The defendant objected to the foregoing evidence on the grounds that the admissions or statements of Alfred Jones,

made long after the deed of trust to McGirk was executed, were incompetent evidence as against McGirk and said Thomas Jones, to disparage their title to, or right in, the land named in said deed. The court overruled said objection and admitted said statements as evidence in the cause, to which ruling exceptions were saved.

The plaintiffs also proved similar statements to have been made by said Alfred Jones, in reference to his having sent money to his son Thomas when in California, to bring him home, some of which statements were made before Thomas returned from California, in 1854 or 1855, and some were made after his return from California, and after the note to Thomas J. Jones purports to have been executed.

The same objections were made to this evidence that were made to the evidence of Iles, and were overruled by the court and exceptions taken. · The witnesses last referred to, each testified that they had been well acquainted with Alfred Jones and Thomas J. Jones for some twenty or thirty years; that before Thomas Jones went to California he resided with his father; had just become a grown man; had no property that witness knew of; and that after he returned from California he had no visible property, except a horse; and that he had made a crop of hemp one season; that he seemed to have no regular business, but had done some work for the Shelbys. Part of these witnesses had been with Thomas J. Jones a portion of the time during which he was in California, and thought that he had no property and had made no money while they were with him; at least that he had no means they knew of.

William H. Day a witness, who was a cousin of Thomas J. Jones, stated that he had been with Jones in California for nearly one year after he went there in 1849; that he made no money to witness' knowledge while he remained with him in California; that witness was intimate with said Jones after his return from California; that witness did not know of any property or money that belonged to said Thomas, before his leaving for the South in 1857; that he came home from Cali-

fornia sometime in the year 1854, and left for the South about the year 1857. This witness, as well as several others, stated on cross-examination, that they were not friendly with Alfred Jones. The said witness also stated that Thomas J. Jones, in conversation with witness after his return from California, stated that he might as well have come home at the same time witness returned, and used other language which induced witness to believe that he had made no money while in California.

The witness, Day, also testified that Alfred Jones, about the month of May, 1864, asked him if he would be the trustee of his wife in the purchase of the debts named in the deed of trust to McGirk, except the debt to Thomas J. Jones; that witness consented to act as trustee for his aunt, the wife of Alfred; that the next day Mrs. Jones furnished him money to purchase said debts; that he purchased said debts and had them all assigned to himself, as trustee, for the use and benefit of May Jones, the wife of Alfred Jones. The evidence of this witness, as well as that of other witnesses, strongly tended to prove that the money with which these debts were purchased was furnished by Alfred Jones, and was really his money. The evidence further shows, that in 1867 or 1868 Mrs. Jones died, and that Thomas J. Jones afterwards purchased, or professed to have purchased, the interest of his brother and sister in these debts, which had been assigned to Day, in trust for Mrs. Jones, and that at the time of the commencement of this suit, Thomas J. Jones claimed to own all of the debts named or provided for in said deed of trust.

The defendants introduced a number of witnesses in support of their defense. Joseph Shelby testified on the part of the defendants, that he was well acquainted with the defendants, Alfred and Thomas J. Jones; that in the years 1856 and 1857 Thomas J. Jones worked part of the time for Thomas Shelby, and part of the time for witness (this was after the return of Jones from California); that he worked for Thomas Shelby for some time at $40 per month, and then worked for witness at the rate of $600 per year; that Thomas J. Jones

helped witness to manage his farm and hands, and assisted in buying and taking care of stock; that Thomas J. Jones at that time had money; that he advanced money to witness to help pay for cattle; that when said Jones quit the service of witness, in the year 1857, witness settled with him, and paid him sixteen hundred dollars, and that witness thought Jones had more money than what he paid him; that a short time after Jones quitted the service of witness in 1857, he left for the South where he had generally remained ever since.

Thomas J. Jones testified on his own behalf, that he had worked for himself, by the permission of his father, from the time that he was seventeen years old; that he had cultivated and raised hemp on his father's lands, his father's negroes sometimes assisting him to cultivate it; that in 1849, when he went to California, he was about twenty-one years old, and had two thousand dollars; that his father gave him a wagon and outfit to go to California; that he took his two thousand dollars in money with him to California; that he did not spend it while there; that he remained in California for about five years, and that some part of the time he made nothing, and during other portions of the time he made money; that when he returned from California he brought home with him, including the most of the two thousand dollars taken to California with him, the sum of nine thousand, five hundred dollars; that a portion of this sum was brought over to New Orleans in gold and gold dust, where he exchanged it for paper money and brought it home; that after he got home he deposited part of his money with a merchant in Lexington, who is now dead, and kept a portion of it himself; that after he had so returned home he worked for some time on his father's farm, and afterwards worked for the Shelbys; that he loaned Joseph Shelby about a thousand dollars while with him, and when he settled with Shelby in 1857, he paid him $1600; that he had also loaned a man in Saline county, a brother of his mother, $2,000; that in the fall of 1857, after he settled with Shelby, his father, having had his house burned down, and being engaged in erecting

another house of brick, worth from five to six thousand dolars, desired him to loan his father the money with which to erect the house, and that he loaned his father $5,350, which included the $1,600 just a short time before paid him by Shelby ; that at the time his father executed to him his promissory note for said amount, which is the same note named in the deed of trust to McGirk. He also stated, that shortly after loaning his father this money he went South, where he remained, in the States of Louisiana and Mississippi, until the year 1861; that he was engaged in "overseeing," in the South, made good wages, sometimes on a yearly salary, and sometimes got part of the crops produced ; that in the year 1861, when the war broke out, he had accumulated, including some money taken with him to the South, seven thousand dollars; that he returned home in 1861, and left with his mother this seven thousand dollars, as well as the note on his father for $5,350, and at the same time told his father that he thought he ought to give him a mortgage to secure said note; that he stayed at home but a short time, when he returned South and joined the Confederate army, and did not return to Missouri again until the year 1865, when his mother returned him the note on his father and a note on his brother-in-law, Duggins, for two thousand dollars, which she had purchased from Alfred Jones with part of witness' money, and the balance of the money left with her in 1861. He also testified, that after the death of his mother, he had purchased the debts assigned to Day for her use, named in the deed of trust, from his brother and sister, for $1,600.

Alfred Jones corroborates the evidence of Thomas J. Jones, in reference to his having large sums of money after his return, and as to his having about two thousand dollars when he went to California, and as to the loan of the sum of $5,350 to him in the Fall of 1857, to pay for the erection of his house. He also states that he was not at that time embarrassed with debts, but that he did not have the money to spare from his business to pay for the erection of his house, and hence borrowed the same from his son, Thomas J. He also testifies that the deed of

trust was executed to McGirk to secure the debts therein named, in good faith, and that all of said debts were just debts, and that they were—all but the debt in favor of Thomas J. Jones—afterwards purchased by his wife with her own money, in the name of William H. Day, her trustee; that his wife had money of her own; that her father had given her a negro woman, and that the said negro had afterwards become the mother of several children, all of whom had afterwards been sold by his wife for three thousand dollars, which was with his consent kept by her in her own right, and used as she pleased, and that it was with part of this money that the notes were purchased by and assigned to Day as trustee for his wife. He denies that he ever made the statements attributed to him by other witnesses, in reference to his having sent money to California to pay the expenses home of his son, Thomas J. Jones, and other statements connected therewith.

Mrs. Duggins, the daughter of Alfred Jones, and William Duggins, her husband, were examined as witnesses for defendant, each of whom testified that after the house of Alfred Jones was burned, in 1855 or 1856, he and his family lived on his farm—the farm now in controversy—in a negro cabin on said farm, until the new brick house was erected in 1857 or 1858; that witnesses resided part of the time with the family of Alfred Jones in said negro cabin; that they were present in said cabin in the Fall of 1857, when Alfred Jones borrowed over five thousand dollars of his son, Thomas J. Jones; that the money was said to be borrowed to pay for the erection of the new house; that they were present when the money was counted; did not count the money themselves, but heard and saw Alfred and Thomas Jones counting the money; that it seemed to be a large quantity of paper money, and that according to the count made in their presence, the money amounted to over five thousand dollars, for which Alfred Jones gave Thomas J. Jones his note at the time. Witnesses did not read the note, but saw Alfred Jones write it and heard it read, and saw it delivered to Thomas J. Jones. These witnesses corroborated the evidence of Alfred Jones

in reference to the $3,000 received by Mrs. Jones for the ne-
groes and also corroborated the other evidence in the case
proving that Mrs. Jones carried a large amount of money in
a belt worn by her around her person.

Henry Jones, a son of Alfred Jones, also testified as to the
money carried by his mother, and as to the purchase by her
of the notes named in the deed of trust.

The plaintiffs introduced a witness in rebuttal, whose evi-
dence tended to prove that in 1864 or 1865, Mrs. Jones seemed
to be destitute of means of any kind whatever, and was unable
to pay a small bill for medical attention to her own person.

Several witnesses were introduced by plaintiff, who testi-
fied that the character of Alfred Jones for truth, was not
good.   After which, defendants introduced about an equal
number of witnesses who testified that the character of Al-
fred Jones, for truth, was good.

At the close of the evidence, the attorneys for the defend-
ants moved the court to exclude from the evidence in the
cause all and each of the admissions or statements of Alfred
Jones given in evidence upon the trial, and which were ob-
jected to at the time, as to the defendant, Thomas J. Jones,
in the consideration of the cause.   The court overruled said
objection and the defendants excepted.

The first question to be considered by this court in the fur-
ther investigation of this case is, whether the evidence ad-
duced on the part of the plaintiffs, independent of the admis-
sions and statements of Alfred Jones, was or is sufficient to
show such a conspiracy or combination, between Alfred Jones
and Thomas J. Jones, to hinder and defraud the creditors of
Alfred Jones, as to make admissions and statements of Alfred
Jones, made either before or subsequent to the time of the
execution of the note and deed of trust to Thomas J. Jones
proper evidence against him.

The general rule certainly is, that the declarations of a
grantor, made after the execution of his deed cannot be used
to defeat it.   There are, however, several exceptions to this
general rule.   One exception is, where several persons have em-

barked in a common object or undertaking. In such case the common object and purpose having been first clearly made out, the declarations of one while engaged in the prosecution of the common object, may be received against another. A very common case where an exception is applied to the general rule, is where a debtor remains in the possession of personal property after a sale thereof. What he may say while thus in possession, is receivable against the vendee as a part of the *res gestæ* to make out a fraud against the creditors. (Waterbury vs. Sturtevant, 18 Wend., 353; Cuyler vs. McCartney, 33 Barb. S. C. 165; Peck vs. Crouse, 46 Barb., 151; Weinrich vs. Porter, 47 Mo., 293; Stewart vs. Thomas, 35 Mo., 202.)

The admissions given in evidence in this case made by Alfred Jones were not made in reference to, or in connection with the possession of personal property which had been sold so as to be explanatory of said possession and thus constitute a part of the *res gestæ;* but if said admissions could be proper evidence as against Thomas J. Jones, it must be on the ground that Alfred and Thomas Jones had entered into a common design to hinder and defraud the creditors of Alfred. This last ground is the one upon which it is insisted by the plaintiffs that the evidence is admissible. Nor does the evidence offered by the plaintiffs, independent of said statements justify the court in finding that any such common purpose or combination existed between the parties, and that the admissions and statements were made while engaged in the prosecution of said common object. If we take the theory of the plaintiffs, that the note given to Thomas J. Jones was a sham, and was executed without any consideration at the time of the execution of the deed of trust in July, 1863, and antedated so as to appear to have been executed in the Fall of 1857, then all of the evidence shows that at the time of the execution of the mortgage, Thomas J. Jones was not in the State of Missouri, and never returned to the State of Missouri until the year 1865. By this it will appear that no combination could have been entered into between Alfred and Thomas J. Jones before the year

1865, while all of the statements given in evidence were made before that time and could not have been made while Alfred Jones was prosecuting a common design between him and his son which the evidence shows could not have been entered into before the year 1865. If we take the evidence of the defendants, and find that the note to Thomas J. Jones was executed in October, 1857, then there is no evidence to show that Alfred Jones was, at that time, in the least embarrassed with debts, or that he was so embarrassed for five years thereafter; so that no motive or excuse existed in 1857 for forming any design to defraud the creditors of Alfred Jones.

It is, however, insisted, that Thomas J. Jones, after he returned to Missouri in the year 1865, assented to a design before made by Alfred Jones to delay and defraud his creditors, and joined with him in said design, and has been assisting him since the year of 1865, in carrying out and accomplishing such design, and that this entering into said design in 1865 will relate back to the time when such design was first formed by Alfred Jones, and make his statements and admissions made from the inception of said design, evidence against said Thomas J. Jones. I cannot exactly see how such a position is to be maintained. If Thomas Jones agreed to a fraud perpetrated for his benefit in 1863, in the year 1865, I cannot see how it would make the statements of Alfred Jones made long before said time, and of which he had no knowledge, evidence against him. If he assented to, and joined the fraud after its perpetration had been commenced, he would be bound by the whole consequences resulting from the fraud; but that would hardly make statements made by the party at a time when he even had no knowledge of the transaction evidence against him. But whether this would be so or not could make no difference unless the evidence, independent of said admissions, is sufficient to prove this common purpose or design.

The evidence of the plaintiff to prove this design to defraud on the part of Thomas J. Jones, aside from the statements of Alfred Jones, consists of the testimony of a number

of witnesses—some five or six—who testify that they have been acquainted with Thomas J. Jones from before the time that he was grown up to manhood, and that they never knew him to have any property either before he went to California or after his return therefrom, and some of the witnesses state that they knew him part of the time he was in California, and did not think that he made any money during that time; and some other evidence was introduced which tends to show that it was not probable that he had as much money as five thousand dollars. On the other hand, Alfred Jones, Thomas J. Jones, Mrs. Duggins, and William H. Duggins, all swear positively to the loan of the money, and swear that they saw him have large rolls of money after his return from California, and Henry Jones swears that he had money.

Joseph Shelby swears that Thomas J. Jones received $1,600 from him shortly before the money purports to have been loaned to Alfred Jones. We would not be authorized to hold that all of these witnesses are guilty of perjury simply from the fact that the neighbors of Thomas J. Jones did not know that he had money, and because his conduct in reference to his money was rather inconsistent with the usual conduct of young men similarly situated. I do not think that, to take all of the evidence together, independent of the statements and admissions of Alfred Jones, it is sufficient to authorize the court to find, in reference to the note executed to Thomas J. Jones, that there was a combination between the father and the son to defraud the creditors of Alfred Jones such as would make the statements of the one in reference thereto, evidence against the other.

The admissions of the petition in bankruptcy filed by Alfred Jones, in evidence, are also objected to as being erroneous so far as Thomas J. Jones was concerned. This petition was filed some five or six years after the execution of the deed of trust to McGirk, and long after plaintiffs had purchased the land in controversy at execution sale and after the commencement of this suit so that we cannot see how anything in the petition and proceedings in bankruptcy filed by Alfred Jones

at that time, while Thomas J. Jones was absent from the country, could be admissible against him, and so far as such proceedings are copied into the bill of exceptions, we cannot see how the evidence could be material in the cause, unless it should be for the single purpose of showing that Alfred Jones was at that time insolvent, or professed so to be.

If the decree made in this case had only declared that the debts named in the deed of trust which had been transferred to witness Day in trust for Mrs. Jones, had been satisfied by the money of Alfred Jones and transferred to Mrs. Jones, in order to keep up an apparent incumbrance on the land in controversy after said debts had been satisfied and paid, and then proceeded to cancel said debts and declare them satisfied so far as plaintiffs were concerned. we would not feel authorized to reverse the judgment in the case. The evidence in the case was sufficient to show that Alfred Jones was attempting to get his property out of his hands for the purpose of hindering and delaying plaintiffs in the collection of their debts against him. The fact that he conveyed all of his real and personal property including all of the stock and farming utensils belonging to him, even his plows and double trees and single trees, and all of his household and kitchen furniture "except such as was exempt from sale under an execution" by the laws of this State, when taken in connection with his statements to witness Iles that he was smart enough to get his money in his pocket and keep it, and the other facts in evidence in this case were sufficient to authorize the court in finding the fraudulent intent on the part of Alfred Jones. And the evidence strongly tended to prove that the debts assigned to Day, as trustee for Mrs. Jones, were paid with the money of Alfred Jones, and Thomas J. Jones only claimed to have purchased the interest of his brother and sister in these debts, and that he holds the balance of the interest in said debts as the heir and representative of his mother, and that he, as to said part, had paid no value therefor, and the evidence showing that the negroes sold, from which his mother professed to have gotten the money to purchase these debts, were

really the property under the laws of this State, of Alfred Jones, a fact which was or ought to have been known to said Thomas J. Jones. The court might therefore very properly have canceled these debts as to Thomas J. Jones, and have satisfied the mortgage to that amount, regardless of the admissions and statements of Alfred Jones given in evidence.

We do not think that the sale by the trustee of the property in controversy to Thomas J. Jones, during pendency of this suit, could in any way affect the rights of the parties. The exclusion of the trustee's deed to Thomas J. Jones by the court when it was offered in evidence, could not therefore have injured the said defendant.

Judge Hough did not sit in this case. The other judges concurring the judgment will be reversed and the case remanded.