WILLIAM A. EADS, Respondent, v. THE METROPOLITAN RAILWAY COMPANY, Appellant.

## Kansas City Court of Appeals, February 2, 1891.

1. **Carrier of Passengers:** DUTY TO PASSENGERS. It is everywhere agreed that carriers must treat their passengers with respect and must endeavor to protect them from injury or insult, not only by their employes, but from strangers and passengers.

2. ———— : PASSENGER'S CONDUCT FORFEITING HIS RIGHTS : FORCE IN EJECTING. The price of the passenger's right to carriage, good treatment and protection by the carrier, is not alone the money he pays, but is also his own good behavior ; and if he is guilty of disorderly conduct without reasonable provocation from the carrier or others, he forfeits his right as a passenger, and the carrier, without using any more force than is reasonably necessary to accomplish the purpose, has the right to eject him.

3. ———— : CONDUCT FORFEITING RIGHT, WHEN FOR THE COURT AND WHEN FOR THE JURY. When the conduct of the passenger is equivocal so that its character must be determined by the manner, tone, gesture or intention, then it should be submitted to the jury. But, when unequivocally bad, demonstrating itself and striking all respectable and orderly people alike, it should be declared disorderly by the court, as if a passenger without reasonable provocation thereto should wilfully or in anger call the conductor of a street car a liar in the presence and hearing of the other passengers.

4. ———— : WHEN RESPONSIBLE FOR MALICIOUS ACTS OF SERVANTS. The carrier is responsible for the malicious and wanton acts of its servant to a passenger, whether done in the line of his employment or not, if done during the course of the discharge of his duty to the master which relates to the passengers ; but the carrier is responsible for such conduct of the servant to a stranger or trespasser, only when the act is in the line of his employment.

5. ———— : ————. What the rule would be where the passenger begins a personal quarrel with the carrier's servant over matters disconnected from the service and thereby provokes an assault, *quære*.

6. ———— : PASSENGER BECOMING STRANGER : RESPONSIBILITY FOR CONDUCT OF SERVANT CEASES WHEN. When a passenger by his conduct unfits himself to be a passenger, it becomes the duty of the carrier

to remove him, and in so removing him the servants are acting in the line of their duty and the carrier is responsible to him, though no longer a passenger, for any unnecessary force, though wanton and malicious, in effecting such removal; but for whatever occurred after his expulsion, the carrier is no longer responsible; and where it is uncertain whether the wrong complained of was inflicted in the course of the expulsion or after its completion, it should be submitted to the jury under proper instructions suggested in the opinion.

*Appeal from the Jackson Circuit Court.*—HON. JOHN W. HENRY, Judge.

REVERSED AND REMANDED.

Statement by the court.

This action is for damages for being forcibly ejected from one of defendant's cable street cars by one of its conductors. Plaintiff entered the car where there were other passengers, including ladies. He paid his fare by giving the conductor a dime, the conductor returned to him a nickel, and passed on out into the gripcar collecting fares. Plaintiff presently discovered that the nickel was mutilated, and, on the conductor's return to the rear car, gave it back to him, receiving in its stead five copper cent pieces. A dispute arose as to whether the nickel was a good one, which resulted in the car being stopped, and plaintiff being ejected by the conductor and gripman whom the conductor summoned to his aid. In ejecting plaintiff, or after he had been ejected, the conductor struck him on the head with his bell-register. The controversy continued off the car. Plaintiff threw the bell-register over the bluff (which was near the street) and the conductor, as he states, menacing him, he pursued him with his drawn knife back to the car. Plaintiff having obtained judgment below, defendant has brought the case here.

Plaintiff's version of the matter on cross-examination, in so far as it relates to the difficulty is as follows: He says that the difficulty occurred between Broadway

and Bluff streets about seven blocks from where he got on; that he paid a dime to the conductor, and he received a nickel in change when the car was within one or two blocks of the place where he got off. "After the conductor gave me the nickel I did not look at it immediately; I held it in my hand before putting it in my pocket; I never had it in my pocket; I held it in my hand until he returned. He had perhaps fifteen or twenty passengers on the gripcar, and collected fare from them and then returned. I noticed it had a hole bored on one side before he got out of the coach, and I then held it awaiting his return. The nickel was what you would call a mutilated one; it was bored in the center on both sides and had corroded until it was black upon both sides and plain to be seen. It was not a plugged one, the hole was not bored through, and I held that nickel waiting till the conductor came back. When he came back, I handed it to him and said, 'Give me another one.' Those were the first words that passed between us. He immediately registered the fare, going upon the assumption that I was paying as a passenger. Then, so that he could understand, I said, 'I paid my fare; give me another nickel.' He had the nickel in his hand. He looked at it and said, 'What is the matter with this?' and I said, 'If there is nothing the matter with it, give me another.' He said 'that it was a good nickel' and insisted on my taking it, and I refused. He then gave me five coppers. I told him 'I did not object to them, as it was good money.' He then left me and went out of the door. He renewed the conversation at the door. He either said I did not get the nickel from him or that it was a good nickel, I do not know which. I would not deny that he said there at the door that it was a good nickel, and when he said that I spoke up and said he was a liar. I do not think he made any remark after I called him a liar. I did say in my direct examination that I called him a liar twice before he took his bell-punch off. I do not know

what was the occasion of calling him a liar the second time, unless it was that he said, 'I did not get it from him,' or something of that kind, and then I repeated that he was a liar. He approached me in taking the bell-punch off. He was taking it off as he came along, and I really do not know whether that was before I called him a liar the second time or not. It may be that as soon as I called him a liar the first time that he turned around and approached me, and then while he was approaching me I repeated my words. And I think I did it in reply to some language he spoke to me. but whether that was when he was approaching me or not I do not know. He pulled his bell-punch off and advanced toward me before I went into my pocket, and when I saw him coming towards me I took out my knife to defend myself against the assault. I took out my knife and said to him, 'If you approach. with that bell-punch, I'll kill you.' I prefixed no oath to the words, 'You are a liar.' I used no profanity in any way, except to call him a liar. He did not strike me in the car, but went out and rang three times and the gripman stopped the car and came back. I do not suppose the gripman knew anything of our controversy. The conductor said to the gripman, 'Put that man off.' The gripman said, 'You will have to get off.' . I said, 'I have paid my fare and I expect to ride.' Then the gripman took hold of my left arm and the conductor on the right side. I do not know that they used any more force than was necessary to put me off. The gripman helped to put me off the car and that ended him so far as I was concerned, and from the time the gripman came back there and assisted in putting me off no more force was used than was necessary to accomplish the purpose of putting me off. I was not bruised in any way by the gripman and am not making any complaint about him. The car stopped, as near as I can place it, in front of the Palisade Hotel, about fifty yards from the turn on Fifth street as you go round the turn onto

Bluff. This was seven blocks and about fifty yards from where I got on. At the time I received the blow on the head I was standing perfectly quiet; had given up all hope of going on that car, and was intending to take the next car. I had given up all hope of going on that car before I was put off, but when I received the blow I was standing perfectly still' there upon the ground. I was standing there, and the conductor was up on the platform. The fact is, while I was standing there perfectly quiet and had given up all hopes of going on that car and intended to take the next car. I stood there with both feet on the ground and the conductor was on the platform. That blow was struck by the bell-punch immediately after I was ejected and before I made any attempt to get on the car or made any threat against the conductor. I never made nor was making any attempt to get back on the car. I had just been ejected, and was not waiting for anything. I did not testify on the trial before the justice that I was struck by the conductor because I took the bell-punch from him. I had released my hold of the gripman. I had taken hold of him, and had pulled him off. The gripman did not have hold of me after we went off the car. I was standing there perfectly quiet with both feet on the ground and the gripman was standing there, neither of us holding to the other. The conductor was upon the platform and swung his bell-punch and hit me on the head. I stooped down and picked up my hat, and as the blood flowed down I looked up and saw the conductor had swung the bell within my reach, and I grabbed it and took it away from him, and, after standing there a moment and his approaching me, I ran over to the bluff and threw it over there. . I suppose I went a distance of twenty-five feet. The conductor followed me to the curbing within ten or twelve feet of me when I threw it over the bluff. I turned round and he stood still there for a time, and I thought he intended to assault me, and I thought I had enough of it and would

drive him to his hole.   Consequently I drew my knife and made a lunge at him.   He attempted to get on the rear platform and failed ; he then ran round to the front end of the gripcar and got on at the coupling. When I threw the bell-punch over the bluff the conductor did not start at once back to the car, neither did he approach me.   He lingered there in a menacing way. He was still standing there when I took out my knife the second time.   I approached him with my knife and followed him until he got into the car.   My intention was, perhaps, to destroy him if I could.   I had been used in such a way that I thought I would be justified in taking his life, and followed him until he ran around the car, with that purpose.   When he got on the car it moved away, and that was the end of it."

*Pratt, Ferry & Hagerman,* for appellant.

( 1 )   We submit that the law is, that if Eads by his own wrongful act brought about a personal quarrel with the conductor, which resulted in the acts complained of, the company is not liable.   The authorities sustain this view.   *Scott v. Railroad,* 6 N. Y. Supp. 382 ; *Peavey v. Railroad,* 81 Ga. 485 ; s. c.,8 S. E. Rep. 70 ; *Harrison v. Fink,* 42 Fed. Rep. 787 ; *Galbraith v. Fleming,* 27 N. W. Rep. 581; *Taylor v. Clendenning,* 4 Kan. 524 ;  *Railroad v. Gants,* 38 Kan. 608, 621 ; *Hall v. Railroad,* 15 Fed. Rep. 61 ; *Railroad v. Cornell,* 112 Ill. 295, 306.   ( 2 ) The master ordinarily is never liable for the act of a servant who while performing no duty steps aside from his employment to do a personal wrong.   *Jackson v. Railroad,* 87 Mo. 422 ; *Railroad v. Peacock,* 69 Md. 257 ; s. c., 14 Atl. Rep. 709 ; Cooley on Torts [ 1 Ed. ] 536, 537.   The true theory of the liability of the carrier for a wilful act of the conductor is the protection the master owes to the passenger. *Dillingham v. Anthony,* 11 S. W. Rep. 139.   If this be true the theory of responsibility, then there can be no

satisfactory answer to the law as we claim it. *Blair v. Railroad*, 31 Mo. App. 224 ; *Railroad v. Peacock*, 69 Md. 257 ; s. c., 14 Atl. Rep. 709. ( 3 ) This case proceeded upon the theory that the objection was unlawful, and a recovery cannot be had upon the theory that it was rightful, but that more force was used than was necessary. *Logan v. Railroad*, 77 Mo. 663.

*John W. Wofford*, for respondent.

On the subject of the liability of the master for the acts of the servant the law is, that the act complained of " must not only be done while so employed, but it must pertain to the particular duties of that employment." *Stringer v. Railroad*, 96 Mo. 302 ; *Snyder v. Railroad*, 60 Mo. 416, 419 ; *Sherman v. Railroad*, 72 Mo. 63 ; *Garretzen v. Duneckee*, 5 Mo. 107, 111 ; *Farber v. Railroad*, 32 Mo. App. 381, 383 ; remarks of BLACK, J., in *Whitehead v. Railroad*, 99 Mo. 270. In Illinois the rule is stated this way : " Railroad company is liable for acts of its servants in the course of their employment, whether abusively or rightfully pursuing the powers conferred on them, and whether acting within or in direct violation of their instructions." *Railroad v. Brown*, 123 Ill. 162 ; *Railroad v. West*, 125 Ill. 320. Same doctrine is held in Louisiana. *Williams v. Car Co.*, 40 La. 87, 417 ; *Spohn v. Railroad*, 87 Mo. 74, remarks of BLACK, J., p. 81 ; 57 Mo. 202.

ELLISON, J.—It is everywhere agreed that carriers must treat their passengers with respect and must endeavor to protect them from injury or insult, not only by their employes but from strangers and fellow passengers. *Spohn v. Railroad*, 87 Mo. 74.

Public vehicles where women and children are frequently found, and where they have a right to demand security from disorderly scenes, are especially ill adapted to exhibitions of belligerence either on the part of the carriers, servants or the passengers. The price of a

passenger's right to carriage, good treatment and protection by the carrier is not alone the money he pays, but is also his own good behavior.

So, if in this case, plaintiff was guilty of disorderly conduct without having been given reasonable provocation for such conduct by the conductor, he forfeited his right as passenger to remain on the car, and the defendants' servants, without using any more force than was reasonably necessary to accomplish the purpose, had the right to eject him.

But it may frequently be a question as to what is disorderly conduct or misbehavior on the part of the passenger. All men do not conduct themselves alike in contact with their fellows. Some are deferential and gentlemanly, while others are not. It is not all conduct which may be said to be outside the pale of good breeding that will bar a passenger from the protection of the law against the carrier for the act of the servant in ejecting him from the car. The case of *Peendergast v. Compton*, S. C. & P. 454, was where an English army officer was excluded from the cuddy of the ship where, as a passenger, he had a right to be and to take his meals. In answer to a suit for damages it was stated "that the defendant as captain of the ship was accustomed to and of right did sit, provide and superintend (at the said table) as his table, and that it was the practice that no one but the defendant should call for or require that wine should be brought, and that it was usual for persons taking their meals there to conduct themselves in a decorous manner, according to the rules of good breeding, and that the plaintiff, on the twentieth of July and divers other days, vulgarly, etc., and contrary to the rules of good breeding, etc., although there were knives, forks, spoons and the usual and proper implements and conveniences on the table, wherewith the plaintiff could and ought to have helped himself to what he wanted, he helped himself to meat, potatoes, etc., by seizing and laying hold of them with his fingers

and hands, and vulgarly and rudely, etc., reached and stretched forth his hands and arms before and in front of persons sitting at the table with him, and in other respects conducted himself in an ungentlemanlike, rude, vulgar, indecorous, offensive and disgusting manner, and in a manner which rendered him an unfit and improper person to take his meals in the cuddy, or to be allowed to be in the same. * * * And also to certain persons belonging to the ship and under the defendant's command, spoke of and concerning the defendant, in a turbulent, threatening, disrespectful and insulting manner, and menaced and threatened to cane and beat the defendant," etc. It was held that it was difficult to say that such manner of eating or helping himself was sufficient to justify plaintiff's expulsion. But that his threat to chastise defendant was sufficient.

It will be seen that it is many times a question whether certain acts or words are disorderly ; they may be equivocal, so that their character must be determined by the manner, tone, gesture or intention. Other conduct is unequivocally bad. It demonstrates itself. It strikes all respectable and orderly people alike. The former class should be submitted to the jury ; the latter should be declared disorderly by the court. If a passenger should give loud utterance to a foul obscenity in the presence of lady passengers, it should no more be submitted to a jury to say whether such conduct was disorderly, than it would be if the passenger had made a grossly indecent exposure of his person. I use extreme cases to better illustrate the meaning.

Now in this case it appears evident from the testimony given by plaintiff as set out in the statement, that when he handed the conductor back the nickel, the latter thought he was paying his fare and so registered it, and on being told that he was returning a mutilated one which had been given him in change, the conductor had a right to express his opinion, in an inoffensive way, that he thought the nickel a good one. If, therefore,

the plaintiff, without having been reasonably provoked thereto by the improper conduct of the conductor, wilfully and in anger called him a liar in the presence and hearing of the other passengers, he was guilty of disorderly conduct and the jury should have been so instructed as was asked in defendant's refused instruction, numbered 11, and plaintiff's instruction should not have submitted that matter to the jury.

II.   In order to dispose of the second branch of this case, it will be necessary to make these observations as applicable thereto. The carrier is responsible for the malicious and wanton acts of the servant to a passenger whether done in the line of his employment or service or not, if done during the course of the discharge of his duty to the master which relates to the passenger. For he owes him, as before stated, not only carriage, but protection also, and if he furnishes a servant who, instead of protecting, insults or assaults, or beats the passenger, he has directly failed of his duty to the passenger. *Goddard v. Railroad*, 57 Maine, 211–218; *Craker v. Railroad*, 36 Wis. 657; *Philadelphia Ry. Co. v. Derby*, 14 How. 468; *Pendleton v. Kinsey*, 3 Cliff. 416; *Bryant v. Rich*, 106 Mass. 180; Thompson's Carriers of Passengers, 369.

We need not say what the rule would be where a passenger begins a personal quarrel with the carrier's servant over matters disconnected from the service and thereby provokes an assault; as in this case the conductor does not appear to have been provoked into a combat as such, as though with an enemy or one who had offended him, but was enforcing the rules of the company for disorderly conduct. He was putting plaintiff off, as he states, for raising disturbance before the ladies.   For this reason instructions, numbered 4, 5 and 6, for defendant, should not be given.   If a passenger wantonly offers a servant a personal insult and the servant resents it on the spot in a personal way without

reference to his duties as a servant, it may be the passenger thus wantonly bringing about the assault could not complain of the carrier, *whatever* were the results. But, for the foregoing reason, it is not necessary to go into such matter.

The carrier is, however, responsible for the malicious and wanton act of the servant to a *stranger or trespasser, only* when the act is in the line of his employment. If the lady in *Craker v. Railroad, supra,* had not been a passenger, the carrier would not have been liable for the assault. But it is a part of the servant's employment to put a trespasser off of the carrier's vehicle, yet he must not kill him by throwing him off while the vehicle is going at great speed. Angel & Ames on Corp., sec. 388 ; *The Northwestern Ry. Co. v. Hack,* 66 Ill. 241 ; *Holmes v. Wakefield,* 12 Allen, 580.

The testimony for defendant tends to show that plaintiff occupied the relation of passenger which he afterwards forfeited by his misbehavior, and thence, on to the close of the difficulty, occupied the relation of a stranger. So when plaintiff, by his conduct, unfitted himself to be a passenger in defendant's car, it became the duty of defendant, a duty it owed to other passengers, to remove him. In removing him the servants were acting in the line of their duty or service to the carrier, and the carrier is responsible to him, though he was no longer a passenger, for any unnecessary force on the part of the servants, though it be wanton and malicious, in effecting such removal. But for whatever occurred after his expulsion, the carrier is no longer responsible ; for such acts of the servants are acts with strangers and are not in the line of their employment. It seems not to be certain when plaintiff was struck over the head with the bell-register. If he was struck after his expulsion was completed, defendant should not be held therefor. But if he was struck during the time he was being put off, or as the final exertion or

effort to get him off, so that the stroke was but a direct continuation of the effort to get him off, defendant would be liable, provided such stroke was not reasonably necessary under all the circumstances surrounding the struggling parties to accomplish the purpose and to prevent his immediately getting back on the car; there being testimony tending to show such was his intention; or provided, further, such stroke was not given in defense of a threatened assault with a knife.

The judgment, with the concurrence of the other judges, is reversed and the cause remanded.