WILLIAM A. EPHLAND, Respondent, v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

71 597
88 80
|s137s187.

Kansas City Court of Appeals, January 6, 1896.*

1. **Appellate Practice**: INSTRUCTIONS: NEW QUESTIONS. Where appellant's instructions at the trial fail to submit certain matters of fact to the jury, such matters are not for discussion in the appellate court.

2. **Evidence**: PARTY AS A WITNESS: TESTIMONY AGAINST HIMSELF. An instruction directing the jury to accept as true anything a party to the record may have testified against his interest, is properly refused.

3. **Passenger Carriers**: INSTRUCTIONS: BRAKEMAN'S DUTY. The refusal of an instruction relating to a brakeman's being in the line of his duty is not reversible error where other instructions imposed like conditions upon the plaintiff's recovery.

4. ————: LIABILITY OF: BRAKEMAN'S DUTY: INSTRUCTION. It is the brakeman's duty on a freight or mixed train carrying passengers to assist in stopping the train whether for ordinary purposes or of averting an accident; and if in so doing he willfully terrorizes and injures passengers, the carrier is responsible and an instruction holding that if his conduct was wanton, malicious and without reasonable ground, the railroad was not liable, is properly refused.

*Appeal from the Henry Circuit Court.*—HON. J. H. LAY, Judge.

AFFIRMED AND TRANSFERRED TO THE SUPREME COURT.

---

*The opinion in the above case reached the reporter November 17, 1897. As the case had been transferred to the supreme court where all papers were forwarded, no briefs were received.

ELLISON and GILL, JJ.—We can not agree to the following opinion. We do not find anything in the record to justify the discussion contained in the opinion. Defendant did not ask to have the questions submitted to the jury, whether Lamb was a "hind" or swinging brakeman; or whether he had any duty to perform in the caboose, whether with the brake or otherwise; or whether he was acting in the line of his employment when he made the exclamations charged. All of defendant's instructions are silent as to each of these matters discussed by Judge Smith.

APPELLATE practice: instructions: new questions.

Defendant had but four refused instructions. The first was merely a demurrer to the evidence. The second was a peremptory direction to the jury to accept as *true* anything plaintiff may have testified to, which was against his interest. We decided a similar instruction to have been properly refused when the case was here before, 57 Mo. App. 162.

EVIDENCE: party as a witness: testimony against himself.

The third (number 5) directed the jury to find for defendant, if they believed that the brakeman, Lamb, "was not in the west cupola, nor at the brake from the time the train left Butler until after the accident." A part of the phraseology of this instruction is misleading. There was but one cupola, though it was sometimes referred to as two, and witnesses spoke of there being an east and west side, but there were not two cupolas in fact. But aside from that objection, there could not possibly have been any harm resulting to defendant from its refusal. The jury must have understood that they were not authorized to find against defendant unless they believed that the brakeman Lamb not only used the language attributed to him, but *also*

PASSENGER carriers: instructions: brakeman's duty.

that he set the brake. This was told to the jury by plaintiff's own instructions, and such condition was put upon plaintiff's recovery. If the jury found that Lamb set the brake just before the accident, it was the same as finding that he was "at the brake" before the accident.

The fourth (number 6) refused instruction directed the jury to find for defendant, notwithstanding that Lamb made the exclamations attributed ——: liability of: to him, and that plaintiff, in consequence, brakeman's duty: jumped from the train, if he made them instruction. wantonly, maliciously and without any reasonable ground therefor. This would be a dangerous rule to announce. Plaintiff, while a passenger, had a right to protection and fair treatment from defendant's servants. That a carrier's servants, whose duty it is to observe the train and provide for its safety and the safety of the passengers by their assistance in its management, especially on the eve of accident, can wantonly throw the passengers into a state of terror, causing injury, and no responsibility attach to the carrier, we believe has not been decided anywhere. It is the duty of a brakeman on a train with brakes like the one in controversy to assist in stopping the train, whether an ordinary stop, or for the purpose of averting an accident. If, in the performance of that duty, he willfully and maliciously terrorizes and injures passengers, the carrier is responsible for his conduct. The instruction omits any reference as to this particular brakeman being in the line of his employment at the time and place, but states broadly, without qualification, that although Lamb did the things charged, yet if he did them maliciously and wantonly, there was no liability. It was properly refused. We have held, though the rule does not have to be invoked in considering this particular instruction, that the carrier is responsible

for the malicious and wanton acts of the servant to a passenger, *whether done in the line of his employment or not*, if done during the course of the discharge of his duty to the master, which relates to the passenger. *Eads v. R'y*, 43 Mo. App. 545.

In our view the case was correctly tried on all the points presented and hence we affirm the judgment.

## ON MOTION TO TRANSFER CAUSE TO THE SUPREME COURT.

SMITH, P. J.—I deem the decision of the majority in the above entitled cause contrary to the following decisions of the supreme court and the St. Louis court of appeals, to wit:

I. *Sherman v. R'y*, 72 Mo. 63; *Cousins v. R'y*, 66 Mo. 572; *Snyder v. R'y*, 60 Mo. 419; *Stringer v. R'y*, 96 Mo. 299; *Garretzen v. Ducnckel*, 50 Mo. 104.

II. *Clark v. Hamerle*, 27 Mo. 70; *De Witt v. R'y*, 50 Mo. 304; *Bank v. Murdock*, 62 Mo. 70; *Stocker v. Green*, 94 Mo. 280; *Crews v. Lackland*, 67 Mo. 619; *Maack v. Schneider*, 57 Mo. App. 434; *Carroll v. R'y*, 60 Mo. 468.

III. *Shirts v. Overjohn*, 60 Mo. 308; *State v. Brooks*, 99 Mo. 137; *Bogie v. Nolan*, 96 Mo. 91; *Payne v. R'y*, 30 S. W. Rep. 148.

And I therefore order the cause certified to the supreme court in conformity to the requirements of section 6, article 6, of the state constitution.

## ON MOTION FOR REHEARING.

ELLISON, J.—The defendant's motion for rehearing, in connection with the reasons and suggestions in support thereof, has been fully considered, and we have arrived at the conclusion that the motion ought not to be sustained. In the view we take of the case, we find nothing in it to justify the extended discussion

which it has received. In submitting the case to us in the first instance, counsel stated orally that the only complaint he had of the action of the trial court was in the refusal of defendant's fifth instruction, and in defendant's brief it is stated that: "As suggested by counsel for appellant in the oral argument, we shall only insist in this court upon a reversal, upon the proposition that instruction numbered 5 (Abst. 85) should have been given on the part of appellant." The instruction referred to was number 5, which we here set out, with all others asked by defendant, whether given or refused. Those given were as follows:·

"3. While the plaintiff had the right to be in defendant's caboose for the purpose of smoking, yet the jury are further instructed that in remaining in said caboose for said purpose, he assumed all the risks therein incident to the ordinary manner in which the business of the company was transacted in said car.

"4. If the jury believe from the evidence that Lamb did not exclaim in the caboose, 'jump off,' or 'jump for your lives,' or use words of similar import, then your verdict must be for defendant.

"7. The court instructs the jury that under the evidence in this case the defendant was guilty of no· negligence in the running or management of the train preceding or of the train following the one on which the plaintiff was a passenger."

Those refused were as follows:

"1. Under the evidence and pleadings in this case, it is the duty of the jury to return a verdict for defendant.

"2. While the plaintiff is a competent witness to testify in his own behalf, yet the jury in determining what weight, if any, they will give his testimony, have the right to consider his interest in the result of this litigation; and what plaintiff has testified to against

his interest, if anything, is to be taken as true, and what he testifies to in his own favor is to be given only such weight as the jury may believe from all the evidence in the case it is entitled to.

"5. If the jury believe from the evidence that William Lamb was not in the west cupola, nor at the brake from the time the train left Butler until after the accident complained of, then your verdict must be for defendant.

"6. Even if the jury believe from the evidence that Lamb exclaimed, 'jump off,' 'for God's sake, jump,' or 'jump for your lives,' or used words of similar import, and that plaintiff, in consequence thereof, jumped from the train and sustained the injuries complained of, yet if such exclamations of said Lamb were made wantonly, maliciously, and without any reasonable ground therefor, then your verdict must be for defendant."

The question, and the only question, which was presented for our consideration was whether it was reversible error to refuse instruction 5. We have held, and still hold, that it was not. We have never stated, as a reason for its having been properly refused, that it failed to include a question whether Lamb was acting in the line of his duty, or whether he was a "swing" or "hind" brakeman.

By reading the instruction anyone will see that it was intended by it to tell the jury, and that it did in effect tell the jury, that if Lamb was not in the west cupola and was not at the brake until after the accident, then he could not have set the brake before the accident, and in view of the evidence for plaintiff locating him there, did not make the exclamations, and therefore the jury should find for defendant. Now, we do not believe the refusal of the instruction deprived defendant of any defense based on Lamb not

being in the line of his duty, or of his not being a hind brakeman. If there is any inference to be drawn from the instruction, it would be that if Lamb was on the west side of the cupola and at the brake, the defendant would have been liable for the consequence of his action, to which witnesses for plaintiff testified. And so it is stated in Judge Smith's opinion that if Lamb was at the brake, though temporarily, the defendant would be liable for his acts. This is not, in reality, denied by defendant, for all of the contention about the matter seems to embrace the proposition that Lamb was not at the brake at all. Such was the testimony of Lamb himself, the conductor, and the other brakeman; all three of them being in the cupola, but, as stated by them, Lamb and the conductor being on the east side, while the rear or hind brakeman was at the brake, just across the aisle, in the west side of the cupola. It is not at all strange that the learned counsel did not, in any manner, ask that the jury should pass on the question whether Lamb was in the performance of his duty, or what kind of a brakeman he was, in the face of the impossibility for a passenger to distinguish between what particular brakes a brakeman may be employed to serve, and the fact that if he was in charge of the brake in the west side of the cupola, he was in the immediate presence of the conductor of the train. Surely no one would contend that under such circumstances a passenger must ascertain which particular car, or which end of a train, a certain brakeman has been employed to attend. The only instance in which it could be claimed that the question of whether Lamb was acting in the line of his employment, was that of the demurrer to the evidence which was submitted to the court. But, as before shown, all points, save that made on instruction number 5, were abandoned by defendant. We may, however, state

that it is apparent, from what we have already said, that the demurrer was very properly overruled.

So we adhere to the original opinion wherein we stated that it was not reversible error to refuse instruction number 5. If we concede that the jury had the most ordinary intelligence, we must know that they fully understood from plaintiff's instruction number 1 that they could not find for plaintiff, unless they believed that Lamb not only made the exclamation attributed to him, but that he also set the brake. The instruction authorized the jury to find for plaintiff, if they believed *those things*. But this was not all. Not only was the instruction conditioned upon the jury's belief of those things, but it continued: "provided, however, you further find as follows;" that these words and acts of the brakeman Lamb induced plaintiff to jump off and that plaintiff believed himself to be in imminent danger, and that he acted as a man of ordinary prudence would have acted under similar circumstances, etc. To allow that the jury possessed any intelligence at all, they must have known, from the wording of this instruction, that they could only find for plaintiff upon the belief of the matters set out therein. *Haniford v. City of Kansas*, 103 Mo. 182.

But there is another reason which justified the court in refusing the instruction, and that is, that for all practical purposes, as applied to the evidence in the cause, it was covered by instruction number 4, given for defendant, wherein it was declared that if the jury believed that Lamb did not make the exclamations "jump," or "jump for your lives," they must find for defendant. The jury, in passing on the question whether the exclamations were made, and whether made by Lamb, as they were required to do by instruction number 4, necessarily had to locate him, for all the evidence showing that the exclamations were made

at all, shows, when properly considered, that the man
who made them, and the man at the brake in the west
side of the cupola, was the same man. In this state-
ment we exclude witness Thrall, who did not know what
exclamation was made, nor did he see anyone.

The result demonstrates that no possible harm was
done defendant by refusing instruction 5. For, in
view of instruction number 4 for defendant (to say
nothing of plaintiff's instruction number 1) the jury
found that the exclamations were made and that they
were made by Lamb; and the conclusion is irresistible,
from the evidence, that the man who made the exclama-
tion referred to in the instructions, was in the west
side of the cupola, at the brake.

Motion overruled. GILL, J., concurs. SMITH,
P. J., dissents and certifies case to supreme court as
being in conflict with certain cases cited by him.

SMITH, P. J.—This is the second time this case has
been brought here on appeal. (57 Mo. App. 147). On
the former appeal, the judgment was reversed and the
cause remanded, since which there has been another
trial, again resulting in a judgment for the plaintiff
and from which defendant has appealed.

It appears from the record now before us that the
evidence adduced by the plaintiff (with the exception
hereinafter appearing) is substantially the same as that
contained in the record on the former
appeal. The theory upon which the case
was submitted to the jury at the instance of plaintiff,
as appears from the instructions given by the court in
his behalf, was, in substance, that if plaintiff was a
passenger on defendant's train, and William Lamb,
the brakeman, carelessly and negligently, and at a
time when there was no real or apprehended cause
therefor, called out in a loud and excited tone of voice,

STATEMENT.

in the presence of plaintiff and the other passengers in the car on which plaintiff was riding, to "jump off, for God's sake, jump—jump for your lives!" or used words of similar import, accompanied by quick and excited action in setting the brake of the car, then such action was negligence, for which defendant was responsible.

The defendant, to support its theory, adduced evidence tending to establish about the following facts, viz., that the train on which plaintiff was riding at the time of the happening of the injury of which he complains was a mixed one—made up of three or four freight cars, a construction car, in one section of which the mail and baggage were carried and in the other passengers, and a caboose which was used as a smoking car, and in which the employees in charge of the the train rode. In the forward part of the said caboose there was constructed a "cupola," extending above the top of the car, on the inside of which were three seats. On the west side of the aisle was the brake, behind which was an elevated seat occupied by the brakeman while engaged in the discharge of his duties, and from which he could, through the lookout in front of him, observe the movements of the train. On the east side were two elevated seats, one of which was for the use of the conductor, who, while occupying the same, could observe through the lookout the forward movements of the train, and the other faced to the rear of the car. At the time of the accident the "hind" brakeman, Little, was occupying the seat on the west side of the cupola and attending to the brake there—the only one in the caboose. It was his duty to attend to this brake. On the other side of the cupola sat the conductor, Abell, in his seat, observing the forward movements of the train through the lookout. On the front seat sat Lamb, the swing brakeman, with his face to the rear of the train and his back to the front of it. He

was not looking forward. Lamb had no duty what-
ever to perform in the caboose, nor had he any duty
to perform in respect to the brake therein, nor to the
passengers in getting on or off the train. It suffi-
ciently appears that the brakeman Lamb had no duty
whatever to perform in the caboose, but that his duties
were elsewhere; and that at the time he made the ex-
clamation, which it is insisted created the consterna-
tion and alarm in the mind of the plaintiff and his co-
passengers, he was in the performance of no duty
whatever. It was not his duty to observe through the
lookout the movements of the train, nor to attend to
the brake there, nor was he then performing any such
duties. He was riding at a place where he had a right
to remain until called to the performance of his duty
elsewhere by oral or signal orders.

The question arising is whether or not the excla-
mation of Lamb—his verbal acts—under such condi-
tions, were those of the defendant, or those
for which it is responsible. The maxim
of *qui facit per alium, facit per se*, em-
bodies the rule, the scope of which is
not limited by express authorization, but extends to
cases where the authority to act is implied only and oper-
ates by establishing an irrebutable presumption in the
circumstances in which it becomes applicable. The
maxim of *respondeat superior* is the legal expression of
the consequences arising from the application of the
rule just stated, where, by reason of the principal's
direct authorization of the acts in question, or by a con-
clusion of law which imputes them to the principal,
whether he authorized them or not, the principal is
precluded from showing that he presumably is not ac-
countable for certain acts. The principle underlying
this very extensive liability is an irrebutable presump-
tion—that the master authorized every act done in the

*Margin note: APPELLATE prac-tice: instruc-tion: new ques-tion.*

advancement of his business, pending the authority, and covered by its objects.    Beven, Prin. Law. Negl., sec. 272.

In giving the judgment of the exchequer chamber in *Berwick v. Bank*, L. R. 2 Ex. 259, it was said by WILLIS, J., that the general rule is that the master is answerable for every such wrong of the servant or agent as is committed in the course of the service and for the master's benefit, though no express command or privity of the master be proved.    In *Story v. Ashton*, L. R. 4 Q. B. 476, Chief Justice COCKBURN said: "The true rule is that the master is duly responsible so long as the servant can be said to be *doing the act in the doing of which he is guilty of negligence, in the course of his employment as servant.*"    In Wood on Master and Servant, section 307, it is stated that:    "By putting the servant in his place he becomes responsible for all his acts, within the line of his employment, even though they are willful and directly antagonistical to his orders.    The simplest test is whether they were acts *within the scope* of his employment, *not whether they were done while prosecuting the master's business;* but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him.    By authorized is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express or positive orders.

And the last named author in his work on Railway Law, section 316, states that the doctrine of *respondeat superior* does not apply simply from the circumstances that at the time when an injury is inflicted the person inflicting it was in the employment of another, but that in order to make the master liable, the act inflicting the injury must have been done in

pursuance of an express or implied authority to do it. That it must be an act which is fairly incident to the employment—in other words an act which the master has set in motion. In Shearman and Redfield on Negligence, section 147, it is said that in determining whether a particular act is done in the course of the employment, it is proper first to inquire whether the servant was at the time engaged in serving his master. But the fact that he is so engaged is not conclusive of the master's liability. The act causing the injury must have been within the scope of the servant's express or implied authority.

As illustrative of the principles upon which the foregoing rules are founded, we might, if space permitted, cite numerous cases from both the English and American reports. We shall, however, only briefly refer to a few of the cases mainly in this state, which we think are in point.

*Snyder v. R'y*, 60 Mo. 419, was where the defendant's servants were not engaged in carrying passengers, nor had they authority to permit persons to ride on the cars (freight cars), with or without compensation, nor that the invitation or permission alleged was in furtherance of the master's interests, or indirectly connected with the service they had engaged to render it. The mere fact that a tortious act is committed by a servant, *while* he is actually employed in the performance of the service he has been employed to render, can not make the master liable. Something more is required. *It must not only be done while so employed, but it must pertain to the particular duties of that employment.* And to the same effect is *Stringer v. R'y*, 96 Mo. 299; *Garritzen v. Duenckel*, 50 Mo. 104; *Douglass v. Stephens*, 18 Mo. 362.

In *Cousins v. R'y*, 66 Mo. 572, it is said that where the servant was at the time the injury was in-

flicted engaged in the performance of the service which
he had engaged to render, but the act which occasioned
the injury did not pertain to the particular duties of
that employment, the master is not responsible. *Sher-
man v. R'y*, 72 Mo. 63, was where a thirteen-year-old
boy got on a freight train, without the knowledge or
consent of his parents, and after he had ridden several
miles he was discovered by a brakeman, who told him
that if he wanted to ride he must help brake. Subse-
quently, while the train was in motion, the brakeman
directed the boy to adjust some boards on the car,
which were falling off, and while in the act of doing
so, one of them striking against a post, hit him and
threw him off the train and broke his leg. The court,
in the course of the opinion, said: "This order of
the brakeman was clearly the proximate cause of the
injury. But for this order and attempted execution of
it, it does not appear that the plaintiff would have been
injured, as the train seems to have gone through safely.
Whether the defendant is responsible for the conse-
quences of the brakeman's request to the plaintiff to
adjust the loose boards, is the sole question to be de-
termined. It is well settled that, to make the master
liable for the tortious act of his servant, the act caus-
ing the injury must have been in the line of the ser-
vant's duty and within the scope of his employment.
Here the testimony shows that the brakeman had no
control whatever over any person on the train and no
concern with them. * * * It was no part of the
duty of the brakeman to employ or to direct any per-
son, *much less a passenger*, to perform any service on
the train, and if, without such authority, he negligently
led plaintiff into danger, such negligence is his own
and can not be imputed to the master."

*Farber v. R'y*, 116 Mo. 81, quotes approvingly from
section 316 of Woods' Railway Law, which is to the

effect that "for the act of a brakeman of the train, who, without the direction of the conductor, should remove a trespasser from the train, the company would not be liable unless express authority to do an act, to which the act complained of is incident, is shown, because the act is not one which comes within the scope or line of his duty;" and cites *Flower v. R'y*, 69 Pa. St. 210; *Coal Co. v. Heeman*, 86 Pa. St. 418; *Marion v. R'y*, 59 Iowa, 428.

*Haehl v. R'y*, 119 Mo. 325, was where a servant of the defendant was employed to keep trespassers away from one of its bridges and while in the course of his employment wrongfully shot and killed a trespasser. The principle of liability of the defendant was thus stated by the court: "The principal is responsible, not because the servant has acted in his name, or under color of his employment, but because the servant was actually engaged in and about his business and carrying out his purposes. He is then responsible, because the thing complained of, although done through the agency of another, was done by himself, and it matters not in such cases, whether the injury with which it is sought to charge him is the result of negligence, unskillful or wrongful conduct, for he must choose his agents for the transaction of his business. *But if the business is done, or it is taking care of itself*, and his servant not being engaged in it, not concerned about it, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has, and can have, no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed, then the wrong is purely the personal wrong of the servant, for which he and he alone is responsible."

In *Canfield v. R'y*, 59 Mo. App. 354, we said, speaking through Mr. Justice GILL, that: "A corporation which selects an agent and gives him charge of a special department of its affairs is responsible for the acts of the agent performed while engaged in the line of his duties, although the particular act may not have been authorized. This responsibility is not confined to acts rightfully performed, but extends to such as are wrongfully done. The test of responsibility is not whether the particular act was rightfully done and specially authorized, but whether it was within the scope of the agent's authority."

The defendant, as supporting its contention, has cited *Golden v. Newbrand*, 52 Iowa, 59. It appears in that case that defendant was the proprietor of a brewery and had one Roenspeiss in his employ, whose duty it was to guard the brewery property and quell disturbances. It further appears that one David Golden, being drunk, threw a brick into the brewery, whereupon Roenspeiss started out after him. Golden turned and ran away and while so running Roenspeiss shot and killed him. On this state of facts the court said: "The theory of appellant is that Roenspeiss was employed to guard and protect the brewery, for which purpose he was furnished with a pistol, and that he shot the deceased while in the line of his duty. Without determining whether, if this was all, the defendant would be liable, we think the fact that the deceased was retreating from the brewery at the time the fatal shot was fired, shows conclusively it was not fired for or with the intent of protecting the brewery, or in the line of Roenspeiss' duty. If Roenspeiss had shot with the pistol from the brewery a person peaceably passing along the highway, the defendants clearly would not have been liable, and we think there is no essential difference between the case supposed and the one at bar.

To protect the brewery did not require Roenspeiss to shoot and kill a person who was retreating therefrom. The killing was not, therefore, done in the line of the duty Roenspeiss was employed to perform.''

But it is useless to multiply authorities. It is too plain for argument that the act of the swing brakeman, Lamb, whether of a willful, malicious or wanton, or of a negligent character, had no sort of connection with his employment. Suppose the fireman or baggageman, neither of whom had any duty of any kind to perform in the caboose, had been occupying the seat in front of the conductor, instead of Lamb, and while so doing had given utterance to the wild exclamation that it is alleged that Lamb did, no one would pretend that the harmful consequences of such utterance could be visited upon the defendant. In such case, can it be said that they had done an act ''in the doing of which'' they had been guilty of negligence, in the course of their employment, as servants of defendant? We think not. If the defendant is not responsible for the negligence of the latter, why for the former, since the wrongful act in one case is as entirely without connection with the employment as in the other. Lamb was a swing brakeman, whose duties were as much outside of the caboose as those of the fireman and baggageman. He was engaged in the performance of no duty, though then in the employment of defendant. If at the time he is alleged to have made the exclamation he was at the brake in the caboose, though only temporarily in charge thereof, in the place of the brakeman who was regularly assigned to duty there, we should not doubt the responsibility of the defendant for the injurious consequences occasioned thereby. But even though he did make the exclamation attributed to him, yet if he was not at the time in the west side of the cupola, nor at the brake from the time the

train started until the accident, we can not discover upon what principle the defendant can be held responsible for the injurious consequences resulting from the former's exclamation.

It seems to us that the defendant was entitled, on the evidence adduced by it, to go to the jury upon this theory, and that the refusal of the court to permit it to do so, as was the case under its instruction number 5, as asked by it, was error.

But the plaintiff contends that the principles of the rule which we have already stated have no application to a case like this, where the relation of carrier and passenger exist. The carrier is responsible for the wanton acts of the servant to a passenger, whether done in the line of his employment or service, or not, if *done during the course of the discharge of his duty to the master which relates to the passenger,* for he owes the latter not only carriage but protection also, and if he furnishes a servant who, instead of protecting, insults or beats the passenger, he has failed of his duty to the passenger. *Eads v. R'y,* 43 Mo. App. 536. But here no such case of insult, assault, or other act of aggressive wrong by the conductor, or his subordinates, appears as brings the case within the rule of responsibility just stated.

*EVIDENCE: party as a witness: testimony against himself.*

*Spohn v. R'y,* 87 Mo. 81, and 101 Mo. 452, was where the conductor uttered the terrifying threat. His utterances were undoubtedly those of a vice-principal and for which the principal was clearly responsible. The plaintiff, we think, is in error in supposing the rule to which we have adverted is inapplicable in every case where the injured party sustains the relation of passenger to the carrier.

*Sherman v. R'y, supra,* was where the injured person was a "free passenger" and the principle was in-

voked and applied in that case. And whether the injured person be a passenger for hire or a free passenger, the duty of the carrier in either case is the same. *Buck v. R'y*, 46 Mo. App. 555; *Wagner v. R'y*, 97 Mo. 512.

It seems clear, therefore, that if the jury should find from the evidence that Lamb was employed by the defendant in the capacity of swing brakeman on the train, and that he gave utterance to the alleged exclamation, which so alarmed plaintiff as to his safety on the train that he leaped therefrom and was hurt, yet if they further should find that at the time of such exclamation Lamb was not at the break, nor in the west cupola, nor discharging any duty he owed defendant, nor acting for defendant's benefit or advantage, nor, indeed, engaged about defendant's business, the defendant is not responsible for his wrongful or negligent behavior.

PASSENGER carriers: instructions: brakeman's duty.

If the evidence adduced by defendant is to be believed, then it is plain that the plaintiff, from his opportunities of observation, either knew or ought to have known that Lamb was neither then acting in the capacity of conductor nor brakeman, and that he was not then engaged in the discharge of any duty within the scope of his employment. The evidence tends very strongly to show that Lamb did not utter the exclamation; or that if he did, it was not while engaged about the defendant's business, and that plaintiff either knew or ought to have known the latter fact. Unless the evidence of defendant's witnesses is wholly unworthy of credence, it is hard to escape the conclusion that the proximate cause of the plaintiff's injury is referable to his own heedlessness and imprudence rather than to the act of the brakeman, Lamb.

The plaintiff's first instruction in effect told the

jury that if the defendant's hind brakeman, Lamb, gave utterance to the exclamation therein stated, whether he was then in the performance of any duty required of him by his employment, or whether he was in the east side of the cupola or not, the defendant should answer in damages for the consequences. And the plaintiff's sixth instruction further told the jury that if there was negligence upon the part of the said Lamb and his negligence was such as might be expected to produce a panic and fright, and did produce that result, the defendant was liable. Thus it is seen that these instructions entirely ignore the defense which the defendant's evidence tended clearly to establish. It had the undoubted and unquestioned right to have this defense considered by the jury. What instruction of either plaintiff or defendant submitted it to the jury? The plaintiff's instructions authorized the jury to find for the plaintiff, if they believed from the evidence that Lamb made the exclamation attributed to him, whether he was then engaged in the performance of any duty enjoined upon him by his employment or not, or whether he was in the east side of the cupola or not, or whether another was in charge of the brake of the car from which plaintiff leaped or not. These instructions utterly ignore the well settled and universally recognized rule of law that the defendant was not liable for the exclamations of Lamb, if made while not in the discharge of any duty and while not on the east side of the cupola in charge of the brake of the car. If Lamb had been in the performance of no duty and had been riding on the east side of the cupola from the time the train left Butler until the accident, and yet if he had made the terrifying exclamation, then under the plaintiff's instructions the jury were authorized to assess the damages resulting therefrom against the defendant. It will not therefore do

to say, as my associates have said, that the jury must, in finding for the plaintiff, have necessarily found the negative of the facts embraced in the hypothesis of the defendant's said fifth instruction. The defendant's defense was clearly established by the evidence adduced by it, and yet, under the instructions, that defense was excluded by the court's instructions from the consideration of the jury. Without the defendant's fifth instruction there was nowhere the slightest intimation by any instruction that the jury were authorized to take such defense into consideration. The only question of fact left to the jury by the instructions was whether the defendant's brakeman, Lamb, made the terrifying exclamations, and if he did, then there was liability on the part of defendant, whether said brakeman was, at the time, engaged in the performance of any duty of his employment or not, or whether on the east side of the cupola away from the brake or not. The defendant, in my opinion, was denied the benefit of a valid, legal defense which its evidence tended to prove. For these reasons I am constrained to dissent from the opinion of my associates. It is my conviction that the judgment should be reversed and cause remanded.